**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marian FUSKO, Defendant–Appellant.**

No. 88–1958.

United States Court of Appeals,
Seventh Circuit.

Argued Dec. 13, 1988.

Decided Feb. 24, 1989.

Fred W. Grady, Portage, Ind., for defendant-appellant.

Patrick D. Hansen, Asst. U.S. Atty., Hammond, Ind., for plaintiff-appellee.

Before BAUER, Chief Judge,
RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

Defendant-appellant, Marian Fusko, appeals her conviction of two counts of mail fraud. Because we believe that the district court erred when it refused to instruct the jury on the affirmative defense of entrapment, we reverse the judgment and remand the case for further proceedings.

## I

### Background

Ms. Fusko was indicted by a federal grand jury of two counts of mail fraud in violation of 18 U.S.C. § 1341. According to the indictment, she intentionally devised a scheme to defraud the State Farm Insurance Company by submitting a false claim and report based on the alleged theft of her automobile. The evidence at trial established the following with respect to the government's charges. In 1984, Ms. Fusko, then twenty years of age, purchased a new automobile. Subsequent to that purchase, she moved from her parents' home into her own apartment. After a while, she began to experience financial difficulties. During this period, she was friendly with Bruce and Carolyn Hall. During the course of her many visits to their home, the subject of her financial difficulties was discussed with some frequency. Accounts of the substance and tenor of these conversations varied with each witness. We shall summarize the most important aspects in the following paragraphs.

During her testimony, Ms. Fusko admitted that she had discussed her financial problems with Mr. and Mrs. Hall. She denied that she entertained, at the outset, any idea of disposing of her vehicle in an unlawful manner. According to her, Bruce Hall initially suggested an "insurance job." At first, the matter was treated lightly; Ms. Fusko did not consider such a course a serious possibility. Her testimony on this point is corroborated by Carolyn Hall. Mrs. Hall testified that, in the early conversations, an illegal disposition was not treated seriously. Ms. Fusko further testified that, during one of her visits to the Halls', Bruce introduced her to his brother Larry. Unbeknownst to Ms. Fusko, Larry Hall was working as an undercover confidential informant for the Federal Bureau of Investigation (FBI). He was compensated for his services in cash on a case-by-case basis. He had become an informant by agreeing to cooperate with the government after he had been convicted of battery. All three Halls—Larry, Bruce, and Carolyn—testified that, at some point during their initial meeting, Ms. Fusko and Larry went outside to discuss getting rid of her automobile. Ms. Fusko claims that the excursion never took place. Mrs. Hall, however, not only corroborated her brother-in-law's testimony that the defendant went outside with him but also indicated that, upon returning to the house, Ms. Fusko seemed somewhat nervous and excited and indicated that her financial difficulties were over.

Bruce Hall's testimony corroborated that of Ms. Fusko in several respects and deviated from it in several other respects. He agreed that, in the original conversations, Ms. Fusko expressed no interest in disposing of her vehicle. He also admitted that he had originally suggested that his brother might be able to get rid of the auto by sale or repossession. He testified that the

defendant had first mentioned an insurance job. However, he admitted that her initial references were made jokingly.

With respect to the period after the first meeting, the testimony of Ms. Fusko and Larry Hall diverge sharply. According to Ms. Fusko, she did not agree to the fraudulent scheme during that first meeting, and only succumbed after repeated telephone entreaties from Larry Hall over the following three months. By contrast, Larry Hall testified that Ms. Fusko manifested little reluctance to engage in an illegal scheme during their first meeting. His testimony focused on five tape-recorded telephone conversations that took place just prior to and after the time he took her auto from a prearranged place in a shopping center parking lot. In those conversations, Ms. Fusko and Larry Hall discussed the arrangements for his taking the car and her filing of the false documentation. Larry also denied making the earlier calls described by Ms. Fusko and denied withholding any tapes.

Special Agent Mark Becker of the FBI also testified. He described the arrest of the defendant and his initial interview with her. According to his testimony, Ms. Fusko admitted that she had told Bruce Hall that she would like to get rid of her automobile and that Mr. Hall introduced her to his brother. She then admitted that she had made arrangements with Larry Hall for the "theft" of the vehicle. Agent Becker also testified that Larry Hall had been the subject of several investigations with respect to alleged fraudulent activity. Larry Hall had not been disciplined with respect to these matters. However, according to Agent Becker, there was substantiated evidence that Larry Hall had been involved in an incident of fabricating evidence and framing a person with respect to the theft of an automobile. Agent Becker also testified that another FBI informer, James McElroy, who claimed to have been with Larry Hall during his conversation with Ms. Fusko outside the Hall residence during their first meeting, expressed the belief that he had helped Larry Hall to entrap her.

Finally, Ms. Fusko testified that, after the illegal transaction, Bruce Hall called her and told her that he needed five hundred dollars to get his brother out of jail and that Larry would disclose the illegal transaction unless she supplied the money. According to Ms. Fusko, she borrowed one hundred dollars from her boyfriend and gave it to Bruce Hall. Bruce admitted receiving the money but denied making any threat.

## II
### Ruling of the District Court

Over the defendant's objection, the district court declined to instruct the jury on the affirmative defense of entrapment. In the view of the district court, the defense was not reasonably raised by the evidence. On the question of the defendant's predisposition, the first element of the entrapment defense, the court found that the only evidence was the defendant's own "self-serving testimony." Tr. at 568. With respect to that testimony, the court commented as follows:

I find her testimony to be less than credible. She's admitted committing fraud, which is a crime of dishonesty. Despite her statements to the contrary, she has motive to be untruthful in this case.

Defendant was the one to first mention the idea of getting rid of her car. She did this with two private citizens, no Government involvement. Bruce Hall testified that Defendant brought the idea up first. There was no Government agents present when she first talked about having her car stolen.

Most importantly, apart from the Defendant's uncorroborated testimony, there's no evidence that she expressed any reluctance to commit the crimes that are charged in this indictment. In fact, all the evidence is to the contrary.

The taped conversations reveal an eagerness on Defendant's part to have her car stolen, and also to obtain a different car from someone who she knew dealt in stolen cars.

Tr. at 568–69.

The district court was also of the view that the government did not induce the

defendant to commit the crime. With respect to this element of the defense, the district court noted:

Likewise, I find that the Government did not induce or entice the Defendant into committing these crimes.

The only evidence that she was induced was her own testimony that there were twelve to thirteen other unrecorded phone conversations. The Defendant didn't explain exactly how or in what way the Government induced her.

Like before I find her statements about alleged inducements less than credible and self-serving.

The evidence in this case shows that this Defendant was without Government involvement the first to mention getting rid of her car, an insurance job, throwing gasoline on it and burning it.

There's no Government involvement in those conversations. She made these suggestions in the company of two private citizens.

No Government agents present again to plant the idea in her head. And finally the taped conversations and the testimony in the case do not reveal any inducements on the part of the Government.

So, I find beyond a reasonable doubt that this Defendant was not induced by the Government.

Tr. at 569–70.

### III

### Discussion

#### A.

The basic law governing the affirmative defense of entrapment is well established. In *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), the Supreme Court noted that it had "consistently adhered to the view ... that a valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." 108 S.Ct. at 886. As then-Justice Rehnquist noted in *United States v. Russell*, the defense is a "relatively limited" one. *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). "It is rooted," Justice Rehnquist continued,

not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "over-zealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the Government.

*Id.*

The basic allocation of responsibility between the judge and the jury with respect to this defense is also well established and follows the traditional allocation of roles in a criminal trial. When there is a substantial question of fact as to the existence of entrapment, the issue is one for the jury to decide like any other question of fact. *Mathews*, 108 S.Ct. at 886 ("The question of entrapment is generally one for the jury, rather than for the court.") (citing *Sherman v. United States*, 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed.2d 848 (1958)); *United States v. Stocker*, 273 F.2d 754, 756 (7th Cir.), *cert. denied*, 362 U.S. 963, 80 S.Ct. 879, 4 L.Ed.2d 877 (1960); *see also United States v. Markham*, 191 F.2d 936, 937 (7th Cir.1951) ("Ordinarily the defense of entrapment raises a question of fact which should be submitted to the jury under proper instructions. *Sorrells v. United States*, 287 U.S. 435 [53 S.Ct. 210, 77 L.Ed. 413] [1932]."); *accord United States v. Douglas*, 818 F.2d 1317, 1320–21 (7th Cir. 1987) ("[A] defendant is entitled to an instruction on his or her theory of defense if: the defendant proposes a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; and the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial."). Therefore, a defendant is entitled to receive an instruction on the entrapment defense whenever "there exists evidence sufficient for a reasonable jury to

find in his favor." *Mathews*, 108 S.Ct. at 887.

### B.

In *United States v. Hawkins*, 823 F.2d 1020 (7th Cir.1987), this court set forth succinctly the initial burden that a defendant must carry to raise the defense of entrapment:

> For a defendant to raise the entrapment defense, he or she must, "produce evidence of both the Government's *inducement* and his own lack of *predisposition*. Once a defendant accomplishes this, the burden shifts to the Government to prove beyond a reasonable doubt that the defendant was predisposed or that there was no Government inducement." *United States v. Perez–Leon*, 757 F.2d 866, 871 (7th Cir.), *cert. denied*, 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985) (emphasis added) (*citing United States v. Gunter*, 741 F.2d 151, 153 (7th Cir. 1984). Both the inducement and predisposition inquiries require an examination of the facts.

823 F.2d at 1024. We now turn to an examination of each of these elements.

1. *Lack of predisposition of the defendant.*

The Supreme Court has characterized the lack of criminal predisposition as "the principal element in the defense of entrapment." *Russell*, 411 U.S. at 433, 93 S.Ct. at 1643; *see also Mathews*, 108 S.Ct. at 886. In elaborating on this element, we have stated that "a 'predisposed defendant is one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense.' *United States v. Gabriel*, 810 F.2d 627, 637 (7th Cir.1987) (citations omitted)." *Hawkins*, 823 F.2d at 1024–25.

■ Our cases have established that an examination of the following factors is important in determining whether a defendant was predisposed to commit the crime: (1) the character or reputation of the defendant; (2) whether the suggestion of the criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *See United States v. Perez–Leon*, 757 F.2d 866, 871 (7th Cir.), *cert. denied*, 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *United States v. Thoma*, 726 F.2d 1191, 1197 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Kaminski*, 703 F.2d 1004, 1008 (7th Cir. 1983). "[T]he most important element of the equation is whether the defendant was reluctant to commit the offense." *Thoma*, 726 F.2d at 1197 (citing *Kaminski*, 703 F.2d at 1008).

With respect to the first factor, Ms. Fusko testified that she had never been involved in such a scheme before. The government presented no evidence that Ms. Fusko previously had been engaged in this or any other type of criminal activity. Regarding the second factor, the testimony at trial made it unclear who had first suggested an illegal disposition of the automobile during the early conversations among Ms. Fusko and Mr. and Mrs. Hall. Ms. Fusko and Mrs. Hall testified that her husband was the first to suggest an illegal disposition. Even Bruce Hall, who testified that Ms. Fusko was the one who first suggested an insurance job, also admitted that, during these conversations, Ms. Fusko was primarily interested in *selling* the car. All three agreed that the suggestion was not treated seriously.

The original contact between Larry Hall and Ms. Fusko was arranged by Bruce Hall. Ms. Fusko testified that she did not know Larry would be coming to the Halls' on the night of their first meeting. The jury was certainly free to assess whether this meeting was fortuitous or by prearrangement between the Hall brothers. There was testimony at trial that Bruce and Larry Hall had worked together on at least two occasions with respect to an illegal automobile transaction. Mrs. Hall

testified that it was Larry Hall's suggestion that he and Ms. Fusko go outside of the Halls' house that evening, claiming he wished to speak to Ms. Fusko in private. With respect to the subsequent contacts, Ms. Fusko testified that she never gave Larry Hall or McElroy her telephone number and that they, not she, initiated those contacts.

With respect to the third factor, it is undisputed that Ms. Fusko acted from a profit motive.

The fourth and fifth factors can be considered together. The fourth factor is, as we already have noted, the most important in determining a defendant's predisposition. *Thoma,* 726 F.2d at 1197. A lack of predisposition is shown if the "evidence demonstrated some degree of Government involvement in coaxing the defendant into committing the offense, and that defendant, for whatever reason, was initially reluctant to become involved...." *Id.* at 1196. We must also remember that, in determining predisposition, the "principal focus ... of necessity must be on the first transaction." *United States v. Gunter,* 741 F.2d 151, 154 (7th Cir.1984). Therefore, the later telephone calls to Larry Hall (in which Ms. Fusko seemed somewhat more willing to engage in criminal activity) are not as relevant as the first meeting at the Halls'. Ms. Fusko testified she was not previously aware that Larry would be present. She also claims that, at that initial encounter, she did not consent to Larry's stealing her car. Rather, Ms. Fusko testified that, at that first meeting with Larry Hall, when he told her he could burn or repossess the car, she responded that she was not ready for such action. Although Larry testified that he only called Ms. Fusko a few times before they arranged for him to take the car, Ms. Fusko testified that he called her about once a week for three months trying to set up an arrangement for him to "steal" her car, and that, during each conversation, she refused to consent to this scheme. She testified that McElroy called her three or four times during this period as well. Mrs. Hall also testified that Ms. Fusko told her that Larry was "bugging" her on the telephone.

According to Ms. Fusko, it was not until almost three months after receiving the first telephone call from Larry that she consented to the scheme.

Finally, we must consider McElroy's statement to Special Agent Becker. McElroy told Agent Becker that he felt he and Larry Hall had entrapped Ms. Fusko. Although Agent Becker says he convinced McElroy he was probably mistaken (because McElroy did not participate in the entire conversation between Ms. Fusko and Larry Hall), the fact that an FBI informant originally thought he had helped entrap Ms. Fusko is a relevant factor that the jury had a right to consider.

### 2. Inducement by the government.

■ A jury can conclude that the government induced the illegal activity only if there is some evidence that the defendant would not have committed the crime had the particular lure the government used not existed. *Hawkins,* 823 F.2d at 1024. The inducement Larry offered to Ms. Fusko was that he would perform for her an essential step in the fraudulent scheme. There is no merit in the government's argument that there was no inducement simply because the government informer was not involved in the actual mailing of the fraudulent documents. The "theft" of Ms. Fusko's automobile was a necessary and integral element in the fraudulent scheme and, especially on this record, cannot be considered a completely separate transaction. Moreover, the jury was entitled to conclude, if it chose to credit Ms. Fusko's testimony, that Larry Hall had coached her on the necessary steps in contacting the insurance company and filing the documentation. *See* Tr. at 521. On the evidence before it, the jury was entitled to conclude that, until the government informant offered this service to Ms. Fusko, she had not considered the alternative of an illegal disposal of the vehicle as a realistic possibility. *Cf. United States v. McLernon,* 746 F.2d 1098, 1113 (6th Cir.1984) (distributorship and marketing opportunities for cocaine sales were

substantial inducements for defendant's first offense).

### C.

With respect to both of these inquiries—predisposition and inducement—we must remember that matters of credibility are within the sole province of the jury. "The verity that the trier of fact may and must make credibility determinations applies with full force to entrapment issues." *United States v. Garcia*, 562 F.2d 411, 415 (7th Cir.1977); *see also United States v. Navarro*, 737 F.2d 625, 636 (7th Cir.), *cert. denied*, 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984); *United States v. Townsend*, 555 F.2d 152, 157 n. 8 (7th Cir.), *cert. denied*, 434 U.S. 897, 98 S.Ct. 277, 54 L.Ed.2d 184 (1977); *United States v. Pingleton*, 458 F.2d 722, 724 (7th Cir.1972). The court makes credibility determinations regarding the entrapment defense only when it serves as the trier of fact in a bench trial. *See, e.g., United States v. Thoma*, 726 F.2d 1191 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Sosa*, 379 F.2d 525 (7th Cir.), *cert. denied*, 389 U.S. 845, 88 S.Ct. 94, 19 L.Ed.2d 111 (1967); *United States v. Green*, 315 F.2d 289 (7th Cir.1963).

There was evidence presented below that the jury reasonably could have viewed as impairing the credibility of both Bruce and Larry Hall. At trial, Bruce testified that, sometime after Larry took Ms. Fusko's car, Bruce called Ms. Fusko and told her Larry needed one hundred dollars because he was in jail. Bruce initially testified that Larry was indeed in jail at that time. Later, however, Bruce recanted this testimony, stating that Larry was not in jail, but needed the money because he had "borrowed the money from somebody else." Tr. at 206. He admitted lying to the jury, attributing it to nervousness. Larry testified that he had borrowed the money from Ms. Fusko. Special Agent Becker testified that Larry Hall had told him that Ms. Fusko agreed to pay Larry one hundred dollars to steal her car, and that Larry had told Bruce to call her and tell her he was in jail so that he could get the money. Larry denied ever telling Bruce to say he was in jail. Moreover, there was evidence that, when Ms. Fusko attempted to collect the money from Larry Hall, Bruce Hall threatened her with a gun and told her to leave his property. Bruce also admitted at trial that he believed he would avoid prosecution for his involvement with Larry Hall in the sale of a stolen car if his testimony in this case were favorable to the government. Larry Hall admitted that he never returned Ms. Fusko's one hundred dollars.

There was evidence presented at trial that Larry Hall had been investigated for fabricating evidence in other cases, and that, at various times, he had deceived the FBI. On one occasion, he parked a stolen car in front of a suspected car thief's home in an attempt to frame the thief; on another occasion, he took a stolen truck and car to Virginia without permission. Ms. Fusko testified that, after Larry had convinced her to participate in the alleged transaction, and after he had taken the automobile he played a tape for her of one of their conversations, and threatened to report her to the authorities if she did not agree to have sexual intercourse with him.

■ We recognize that much of the evidence suggesting entrapment was presented by Ms. Fusko's own testimony. However, a defendant's testimony alone can constitute sufficient evidence to raise the entrapment defense. *See Garcia*, 562 F.2d at 415. The issue came down to one of conflicting testimony, and the determination of whose testimony was more credible was an issue for the jury.

### Conclusion

■ On this record, the defendant produced sufficient evidence on the affirmative defense of entrapment to require its submission to the jury. It is within the province of that body, rather than the district court or this court, to determine whether the evidence submitted to establish that defense ought to be believed. Accordingly, the judgment of the district

court is reversed and the case is remanded for further proceedings.

REVERSED AND REMANDED.