**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Alvaro LAZCANO, a/k/a Jose A. Lazcano, Defendant–Appellant.**

**No. 88–2704.**

United States Court of Appeals, Seventh Circuit.

Argued April 14, 1989.

Decided Aug. 2, 1989.

Stephanie Uhlarik, David J. Stetler, Asst. U.S. Attys., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Clarence L. Burch, David Delgado, Burch & Delgado, Chicago, Ill., for defendant-appellant.

Before CUDAHY, POSNER, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Alvaro Lazcano appeals a jury verdict convicting him on two counts of knowingly distributing heroin in violation of 21 U.S.C. § 841(a)(1). He submits that the conviction should be reversed because (1) he was entrapped as a matter of law, and (2) the district court committed reversible error in admitting into evidence a statement made by a person not present at trial. We now affirm the defendant's conviction.

## I

## FACTS

### A. The Government's Case

At trial, the witnesses who testified on behalf of the government supplied the following information. On February 28, 1988, at the El Pobre Jose bar on North Avenue in Chicago, the defendant Alvaro Lazcano met with Angel Ortega to discuss a sale of heroin. Unbeknownst to Mr. Lazcano at that time, Ortega was a Drug Enforcement Administration (DEA) informer. The two heroin sales that followed this initial encounter form the basis of the conviction from which the defendant now appeals.

Ortega was introduced to Mr. Lazcano (then known to Ortega as "Alvaro Herrera") by a Colombian man who had told Ortega that Mr. Lazcano would be able to sell him drugs. During this first conversation, Mr. Lazcano and Ortega negotiated over the price, quality, and quantity of heroin. As part of these negotiations, Ortega first demanded that he inspect a sample of the heroin for quality before consummating a deal. Mr. Lazcano agreed and told Ortega that he would attempt to provide a sample for inspection. The next day, Ortega and the defendant met again at a restaurant. Mr. Lazcano stated that he was unable to obtain a sample, which cost $400 per gram. However, Mr. Lazcano told Ortega that he was still willing to arrange any purchase that Ortega desired; indeed, he stated that he had five kilograms of heroin at his disposal. Ortega replied that he was still interested. After talking with another man in the restaurant, Mr. Lazcano told Ortega that he would arrange a sale of at least one kilogram at a price of $190,000 per kilogram.

For various reasons, this transaction fell through.[1] On March 14, Ortega met with

---

1. Ortega and Mr. Lazcano agreed that the one-kilogram sale would take place in Miami. Ortega planned on cooperating with his usual DEA contact—Agent Leo Arreguin—as the undercover purchaser in Miami. Ortega had worked with Agent Arreguin for the preceding five years before the agent's transfer from Chicago to Miami. Tr. at 124.

several Chicago-based DEA agents, including Agent Frank Tucci, to discuss arrangements for an alternative undercover purchase of drugs from the defendant. Ortega told them that Mr. Lazcano had approximately five kilograms of heroin stashed at a hotel near O'Hare Airport and was willing to sell high quality heroin for $5,500 per ounce. At this meeting, Ortega also stated that the defendant's name was Alvaro Herrera, that he was from the Durango area of Mexico, and that he was a member of the Herrera crime family—a large narcotics organization operating in the Chicago area. Ortega also told the agents that he believed Mr. Lazcano lived above the El Pobre Jose and that Mr. Lazcano could only be contacted through the public telephone at the bar.[2] The agents agreed to stage an undercover operation.

The next day, the DEA agents observed Ortega meeting with the defendant at the restaurant. At this meeting, Ortega and the defendant agreed to the sale of one ounce of heroin for $5,500 the following day at the O'Hare Plaza Hotel. On March 16, Agent Tucci and Ortega drove to the hotel, carrying $5,500 in marked government funds, and waited for the defendant to arrive and meet them in the hotel's parking lot. Soon afterwards, the defendant arrived and parked next to Agent Tucci's car. Ortega and Mr. Lazcano had a brief conversation in Spanish, after which the defendant removed a small package from his coat pocket and handed it to Ortega. Ortega, in turn, handed the package to Agent Tucci, who opened the package and examined the black rocky chips inside, which looked and smelled like heroin. Agent Tucci then paid the defendant the $5,500 purchase price; the defendant and Ortega also agreed that they would make arrangements for further sales of heroin. At approximately 8:00 p.m. that evening,

the defendant and Ortega met again. Ortega told Mr. Lazcano that Agent Tucci had been pleased with the quality of the heroin sample obtained earlier that day and that they were ready to purchase two kilograms of heroin.

Several days later, on March 18, Mr. Lazcano telephoned Ortega at his home and said that he was only going to sell fifteen ounces of heroin to Ortega and Agent Tucci, not the two kilograms originally discussed. However, the transaction did not occur that evening because Mr. Lazcano never contacted Ortega to confirm the delivery location. On March 20, Ortega managed to contact Mr. Lazcano. The defendant told Ortega that the heroin had arrived too late on March 18 in order to consummate the deal on that date, but that he was now ready to proceed.

The following morning, on March 21, the DEA agents prepared to make the undercover purchase and the arrest of Mr. Lazcano. At approximately 2:00 p.m. that afternoon, Agent Tucci, accompanied by Ortega, arrived at the parking lot in which the defendant's car was parked. Mr. Lazcano approached their vehicle, and had a short conversation in Spanish with Ortega. After this brief conversation, Ortega told Agent Tucci that Mr. Lazcano had the package in his car. Agent Tucci then got out, walked across the parking lot, and entered the defendant's car. Mr. Lazcano then informed Agent Tucci that he did not have fifteen ounces of heroin, but rather, he had only ten ounces available at that moment, and that he would sell Agent Tucci another ten ounces later that day. Mr. Lazcano further stated that, should both deals be properly consummated, he would be able to sell Agent Tucci two kilograms of heroin at a more economical price on the following day. Rather than negotiate the defendant's offer, Agent Tucci asked to

---

Sometime between March 4 and March 13, 1988, Mr. Lazcano called Ortega on several occasions; apparently, Mr. Lazcano was having difficulty arranging the transportation of heroin to Miami. The defendant told Ortega that one of his colleagues "did not want to go to Miami, that he was a little bit afraid, that they wanted me [Ortega] to process part of the money here so that they could take the heroin there." Tr. at

136. Faced with this situation, Ortega then proposed that the transaction take place in Chicago instead. Tr. at 138.

2. As discussed further, *infra* note 3, these facts regarding Mr. Lazcano's name, membership in the Herrera family, and residence all later proved to be incorrect.

inspect the ten ounces of heroin that Mr. Lazcano then had for sale. The package contained heroin, but of apparently different quality from the earlier purchase. Mr. Lazcano assured Agent Tucci that the heroin was nonetheless good; seeking a second opinion, Agent Tucci had Ortega inspect the package, and the informer gave his approval. The agent then got out of the defendant's car and returned to his own vehicle, under the pretense of obtaining the purchase money. At that time, however, Agent Tucci gave a prearranged arrest signal to other DEA agents who had been conducting surveillance of the area. The agents moved in, and arrested Mr. Lazcano.

Subsequent analysis of the one-ounce sample sold by the defendant on March 16 revealed that it was 22.39 grams of 20% pure Mexican heroin; analysis of the ten-ounce package delivered on March 21 revealed that it contained 250.25 grams of 15% pure Mexican heroin. Agent Tucci testified that the street value of the total amount of heroin sold by the defendant to him on March 16 and March 21 was approximately $300,000.

### B. The Defendant's Case

The defendant's version of the events in question came from his own testimony. He claimed that, at the first meeting, Ortega and the Columbian man wanted to sell him marijuana and inquired if he knew of anyone who wanted to sell cocaine. He replied that he did not. When asked several days later by Ortega if he had procured "the coke," the defendant told him that he had not tried. Ortega then asked him to get heroin and repeated that request on several occasions. He claims that Ortega finally persuaded him to carry the drugs to the two transactions described in the foregoing section. According to Mr. Lazcano, Ortega was the seller in both transactions.

### II

### ANALYSIS

#### A. Entrapment

Mr. Lazcano submits that his conviction should be reversed because he was en-

trapped by the government as a matter of law. Appellant's Br. at 24. Recently, in *United States v. Fusko*, 869 F.2d 1048 (7th Cir.1989), we had occasion to summarize the principles governing the affirmative defense of entrapment:

> The basic law governing the affirmative defense of entrapment is well established. In *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), the Supreme Court noted that it had "consistently adhered to the view ... that a valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." 108 S.Ct. at 886. As then-Justice Rehnquist noted in *United States v. Russell*, the defense is a "relatively limited" one. *United States v. Russell*, 411 U.S. 423, 435, 93 S.Ct. 1637, 1644, 36 L.Ed.2d 366 (1973). "It is rooted," Justice Rehnquist continued,
>
>> not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "over-zealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a defendant who has committed all the elements of a proscribed offense, but was induced to commit them by the government.
>
> *Id.*

*Fusko*, 869 F.2d at 1051. Here, the focus of Mr. Lazcano's submission is on the second element of the defense—his lack of predisposition to commit the crimes. He submits that the record establishes this element as a matter of law. In evaluating the claim, the governing legal principle is clear: Entrapment as a *matter of law* "only occurs when the absence of defendant's predisposition appears from the uncontradicted evidence." *United States v. Kaminski*, 703 F.2d 1004, 1007 (7th Cir. 1983); *see also United States v. Thoma*, 726 F.2d 1191, 1197 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984); *United States v. Navarro*, 737

F.2d 625, 635 (7th Cir.), *cert. denied,* 469 U.S. 1020, 105 S.Ct. 438, 83 L.Ed.2d 364 (1984).

Upon review of the evidence in this case, we conclude that Mr. Lazcano was not entrapped as a matter of law. In elaborating on predisposition, this court has stated that "a 'predisposed defendant is one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense.'" *United States v. Hawkins,* 823 F.2d 1020, 1024 (7th Cir.1987) (quoting *United States v. Gabriel,* 810 F.2d 627, 637 (7th Cir.1987) (citations omitted)). Our analysis of a defendant's predisposition in an entrapment case examines five separate factors: (1) the character or reputation of the defendant; (2) whether the suggestion of the criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *See United States v. Molinara,* 877 F.2d 1341, 1349 (7th Cir. 1989); *Fusko,* 869 F.2d at 1052; *United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *Thoma,* 726 F.2d at 1197; *see also Kaminski,* 703 F.2d at 1008.

When the record is reviewed in light of these factors, it is clear—abundantly clear—that Mr. Lazcano's claim that he lacked a predisposition to commit the crimes is not established by uncontradicted evidence. In particular, the record shows that the government offered evidence that Mr. Lazcano willingly discussed specific terms of drug sales on numerous occasions, including his initial encounter with Ortega, *see* Tr. at 114–16; the government offered solely money as inducement, and always at the price stipulated by the defendant; and,

most importantly, *see Kaminski,* 703 F.2d at 1008, the record is not uncontradicted on the defendant's reluctance. Indeed, to the contrary, Mr. Lazcano tried to accommodate his customers' wishes and curry their favor on several occasions. *See, e.g.,* Tr. at 148–50, 157–59. When viewed in the light most favorable to the government, *see Navarro,* 737 F.2d at 625, the record reveals that, rather than the defendant being entrapped as a matter of law, there was at least a "substantial question of fact" regarding Mr. Lazcano's entitlement to the defense. *See Fusko,* 869 F.2d at 1051.

Because the testimony on the issue of predisposition was controverted, the district court properly submitted the issue to the jury. As we recently stated in *Fusko, supra:*

> When there is a substantial question of fact as to the existence of entrapment, the issue is one for the jury to decide like any other question of fact. *Mathews* [*v. United States,* 485 U.S. 58, 108 S.Ct. 883, 886, 99 L.Ed.2d 54 (1988) ] ("The question of entrapment is generally one for the jury, rather than for the court.") (citing *Sherman v. United States,* 356 U.S. 369, 377, 78 S.Ct. 819, 823, 2 L.Ed.2d 848 (1958)).

869 F.2d at 1051. *See also United States v. Markham,* 191 F.2d 936, 937 (7th Cir. 1951) ("Ordinarily the defense of entrapment raises a question of fact which should be submitted to the jury under proper instructions. *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 [1932].");	*accord United States v. Douglas,* 818 F.2d 1317, 1320–21 (7th Cir.1987) (defendant entitled to entrapment jury instruction if: "the defendant proposes a correct statement of the law; the defendant's theory is supported by the evidence; the defendant's theory of defense is not part of the charge; and the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial"). The jury heard the defendant's argument on entrapment[3]

**3.** In a nutshell, the defendant's entrapment argument was based on: (1) Ortega's status as a professional paid informer who had earned

$143,000 from the DEA since 1982 for information, rewards, and expenses; (2) the assertion that Ortega, desperate to make more money,

and listened to the district court's instruction on the defense,[4] but nevertheless found Mr. Lazcano guilty.

### B. Hearsay

Mr. Lazcano next submits that the district court erred in admitting evidence that Ortega was introduced to the defendant by the Colombian man who referred to Mr. Lazcano as a member of the Herrera crime family. Appellant's Br. at 29. According to Mr. Lazcano, Ortega's reference to "the Colombian's" statement[5] was highly prejudicial hearsay showing that the defendant was predisposed to selling drugs and thus undermining his entrapment defense. Mr. Lazcano maintains, therefore, that the district court's admission constituted reversible error.

The principles that must control our evaluation of this issue are well established. Federal Rule of Evidence 801 defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, *offered* in evidence *to prove the truth of the matter asserted.*" Fed.R.Evid. 801(c) (emphasis supplied). Therefore, not all out-of-court statements admitted at trial are excludable under the hearsay rule. *See* Fed.R.Evid. 802. "[A]n out of court statement is not hearsay if it is offered for the limited purpose of explaining why a government investigation was undertaken." *United States v. Love,* 767 F.2d 1052, 1063 (4th Cir.1985), *cert. denied,* 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 890 (1986).

■ An examination of the record makes clear that Ortega's testimony regarding the Colombian man's statement that the defendant "was from the Herreras from Durango," Tr. at 120, was not offered to prove that Mr. Lazcano was indeed a member of the Herrera family, but rather, to set the context in which the DEA investigation originated. Consequently, the statement was not hearsay. *See United States v. Mancillas,* 580 F.2d 1301, 1309 (7th Cir.) ("For this purpose, outlining the background of the investigation, with the evidence not being offered to prove its truth, it could be said not to be nonadmissible as hearsay."), *cert. denied,* 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). Moreover, the district court carefully admonished the jury that it was to consider the information (some of it elicited by the defense on cross-examination) only for the purpose for which it was offered. Finally, we note that the jury was also informed that the government had learned later that the defendant's name was not Herrera. Tr. at 49. There was no error.

### CONCLUSION

The issue of entrapment was submitted to the jury because there was a controverted issue of fact with respect to the defendant's predisposition. The record supports the jury verdict. The trial process was not infected by the admission of hearsay. Accordingly, we affirm the judgment of the

---

framed Mr. Lazcano by initiating DEA interest in the defendant by the use of false information regarding Mr. Lazcano's name and background, and furthered the crimes by providing Mr. Lazcano with heroin to sell to Agent Tucci; and (3) the many delays in delivery and broken deals, together with the defendant's lack of any prior police record, served as evidence of Mr. Lazcano's lack of criminal predisposition. Therefore, Mr. Lazcano argued to the jury, the government entrapped him. *See* Tr. at 470–77.

4. Mr. Lazcano raises no objection to the correctness of the jury instructions.

5. The testimony to which the defendant objects reads as follows:

Q. At what point had you received information that his last name was Herrera and from whom?

MR. BURCH: I would object as hearsay, the truth of the matter asserted.

MR. PODLISKA: We are not offering it that his actual name is Herrera, simply that that was the name he was being called.

THE COURT: Overruled.

BY THE WITNESS:

A. When the Colombian introduced him to me, he told me that Alvaro was from the Herreras from Durango.

BY MR. PODLISKA:

Q. And when the Colombian told you that, was Alvaro standing with the two of you?

A. No.

district court.[6]

AFFIRMED.

Tr. at 119–20.

**6.** The district court sentenced Mr. Lazcano to serve concurrent sentences of seven years' imprisonment on the two counts of heroin distribution. The court additionally imposed concurrent four-year terms of supervised release following imprisonment, with the further condition "that if the defendant is deported, he may not return to the United States." R.44 at 3. In his brief, Mr. Lazcano argues that this latter condition "is clearly beyond the scope of judicial authority." Appellant's Br. at 31. As he conceded at oral argument, however, this type of condition may be imposed as part of a sentence of supervised release. Under 18 U.S.C. § 3583(a), the district court may place a defendant who has been sentenced to a term of imprisonment for a felony on a term of supervised release after imprisonment. Furthermore, with regard to an illegal alien defendant like Mr. Lazcano,

the court may provide, as a condition of supervised release, that he be deported and remain outside the United States, and may order that he be delivered to a duly authorized immigration official for such deportation.

18 U.S.C. § 3583(d). Accordingly, we cannot vacate the defendant's sentence.