936 F.2d 575
 UNPUBLISHED DISPOSITION
NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Charles A. LOVE, Defendant-Appellant.
 No. 90-2265.
 United States Court of Appeals, Seventh Circuit.
 Argued April 11, 1991.
Decided June 24, 1991.
 
 Before CUMMINGS, CUDAHY and KANNE, Circuit Judges.
 
 ORDER
 
 1
 In May 1989 defendant Charles A. Love was the subject of a three-count indictment charging him with distributing cocaine in violation of 21 U.S.C. Sec. 841(a)(1). The jury found him guilty under all three counts. Subsequently he was sentenced to concurrent terms of 18 months on each count with the recommendation that he be incarcerated in the Federal Medical Center in Rochester, Minnesota, for drug treatment.
 
 
 2
 In October 1988 Mark Hexamer, a custodian at the Chicago Bulk Mail Center in Forest Park, Illinois, contacted postal inspector Robert Williams to provide him with names of postal employees engaged in illegal drug activity. The two of them met with a postal inspector named Walsh on October 12, 1988, and at that time the inspectors entered into an agreement with Hexamer for him to serve as a confidential informant with respect to postal employees involved in illegal drug activity. In return, the postal inspection service offered to attempt to transfer Hexamer out of the Chicago Bulk Mail Center in accordance with his wish. At the same meeting, Hexamer provided the inspectors with a list of postal employees using illegal drugs, but defendant's name was not on that list.
 
 
 3
 Subsequently Hexamer suspected that fellow postal employee Love would be willing to sell cocaine. In early November Hexamer mentioned to defendant that a co-worker was to get Hexamer some marijuana. Defendant responded that he could get Hexamer marijuana or "anything you want." After relaying this information to Inspector Williams, Hexamer spoke to defendant later the same day and asked defendant whether he could obtain cocaine, and defendant replied affirmatively. Shortly thereafter, Hexamer asked defendant whether he could provide Hexamer with a specific amount of cocaine, and defendant replied affirmatively. This caused Hexamer to make an appointment with defendant to purchase cocaine, but this first sale was aborted because of inclement weather.
 
 
 4
 Two weeks later Hexamer met defendant and made an appointment to purchase 1/16 of an ounce of cocaine for $110 on November 22. Inspector Williams planned to attend the meeting as Hexamer's cousin and the prospective buyer.
 
 
 5
 On November 22 Williams and Hexamer met defendant adjacent to Hexamer's car at the Chicago Bulk Mail Center parking lot. Defendant then entered another car, returned and entered Hexamer's car. The conversation of Williams, Hexamer and defendant was recorded during their ride, and the tape was introduced into evidence and played to the jury. During the ride in Hexamer's car, defendant told Williams that he would like his cocaine purchase because "The package is strong," thus referring to a package of narcotics of good quantity and quality.
 
 
 6
 During the drive, defendant told Hexamer to stop at a gas station where defendant made a telephone call and then asked Inspector Williams for $110 in cash. Defendant then told Hexamer to drive to 17th Place and Warren Avenue in Chicago, where the three men waited for defendant's source to bring the cocaine. Defendant said his source was on the way and that Williams would "like this toot," referring to the cocaine. While waiting, defendant said he could obtain "8 balls[1] for 170" and that he could procure larger quantities for 400 to 500 dollars or " 1/16" for $80 from a tall Puerto Rican friend.
 
 
 7
 A few minutes later, a fourth man entered the back seat of Hexamer's car. Defendant gave him $110 for a package of white powder which defendant then handed to Inspector Williams. At defendant's suggestion, Williams then gave defendant $10 for obtaining the cocaine. A laboratory analysis showed that the white powder sold to Williams weighed 1.67 grams and was 94% cocaine.
 
 
 8
 A few days later, Hexamer arranged with defendant for a second sale of cocaine to Williams on November 30. On that date, defendant and Hexamer arrived in the latter's car at a Forest Park, Illinois, mall parking lot. Williams, who was already there, handed defendant $300, and defendant agreed to return with the cocaine. Hexamer then drove defendant to his home where he made a telephone call and then was driven by Hexamer to an apartment building where they picked up another male. The unidentified male was dropped at his mother's or grandmother's house. He later emerged and handed defendant a package of cocaine in Hexamer's car.
 
 
 9
 After dropping off the unidentified male Hexamer drove to the mall with defendant, who handed Williams a package containing a white powder which proved to be 6.89 grams of a mixture containing 48% cocaine. Williams then gave defendant $10 for arranging this purchase.
 
 
 10
 On April 5, Hexamer telephoned defendant who said he would meet Williams and Hexamer after work and sell Williams a quarter of an ounce of cocaine for $300. During a meeting later that day, Williams gave defendant $300. Defendant told Williams that he would deliver the cocaine after his source came to his house. Williams then drove to defendant's residence early in the evening and picked up a plastic bag containing a white powder. The substance in the bag proved to weigh 4.43 grams and tested positively for 86% cocaine. Thereupon the inspector offered to give defendant some of the cocaine. He was arrested shortly thereafter.
 
 
 11
 Defendant was taken to the main post office in Chicago and given his Miranda rights. He read and signed a warning and waiver of his rights and then confessed to participating in the three sales of cocaine to Williams. He stated that "Mike" was his supplier for the second sale and that "Bo" was the third supplier. He did not claim that Hexamer had solicited these sales or that he was opposed to selling the cocaine.
 
 
 12
 At defendant's trial, he testified that he had been a drug addict and that he and Hexamer had smoked marijuana at least ten times together. He admitted that he engaged in the three cocaine transactions with Hexamer and Williams in November 1988 and April 1989 but said he had not sold cocaine before. During his cross-examination, he conceded that he never told Williams he was reluctant to deal in cocaine and never told him or any other inspector that Hexamer had pressured him into the three sales.
 
 Entrapment Defense
 
 13
 Defendant's main argument at trial was that he had been entrapped. Once a defendant successfully raises the defense of entrapment, the burden shifts to the prosecution to prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. Sherman v. United States, 356 U.S. 369, 373; United States v. Thoma, 726 F.2d 1191, 1196 (7th Cir.1984), certiorari denied, 467 U.S. 1228. Defendant contends that the government failed to meet this burden.
 
 
 14
 We view the evidence in the light most favorable to the prosecution and must affirm the conviction if any rational trier of fact could have found the defendant's predisposition to commit the crime beyond a reasonable doubt. United States v. Rivera-Espinoza, 905 F.2d 156, 158 (7th Cir.1990).[2]
 
 
 15
 A rational juror could easily have found from the evidence at trial that defendant was predisposed to commit the charged offenses. Defendant made the first offer to sell drugs to Hexamer when Hexamer mentioned that he was obtaining drugs from another postal employee. For each of the three cocaine sales, defendant contacted the supplier, told Hexamer and Williams where to meet, obtained the purchase price from Williams before the supplier arrived, and requested a bonus, albeit modest, for each deal. Defendant received money for himself from Williams in the first two transactions and a $20 bag of cocaine from supplier Bo with respect to the third.
 
 
 16
 The taped conversation of November 22 showed in addition defendant's familiarity with drug trades. He used the parlance of dealers and in fact bragged to Williams that the cocaine being sold him was of good quality. Defendant offered to furnish Williams with larger quantities of cocaine and referred to an aborted drug deal with a different buyer.
 
 
 17
 In sum, defendant showed no reluctance to commit the crimes with which he was charged, and reluctance is the most important element of predisposition. United States v. Fusko, 869 F.2d 1048, 1052 (7th Cir.1989). Defendant initiated the sales. Certainly there was no repeated government persuasion to cause defendant to arrange for the continued cocaine sales. The defendant seems to have been motivated, at least in part, by profit. In these circumstances, there was no entrapment because defendant was "merely offered an opportunity to commit a crime, coupled with what can at most be described as mild inducement." Thoma, 729 F.2d at 1198. Defendant's actions can fairly be attributed to his own predisposition.
 
 Exclusion of Drug Addiction
 
 18
 Defendant's second argument is that the trial judge erroneously excluded evidence of his prior drug addiction and efforts at rehabilitation. Defendant contends that evidence of defendant's rehabilitation efforts would have been "of great probative value" (Def.Br. 8) in determining whether he would have committed the crime in the absence of the government's inducement.
 
 
 19
 Defendant cannot prevail on this argument even if we assume that he is correct about the probative value of the evidence regarding rehabilitation. An examination of the record shows that during his direct examination defendant's counsel did elicit from Love evidence about his prior addiction and his effort to overcome the addiction. Tr. 152, 153. Counsel for defendant was free at trial to argue about the impact of his addition and subsequent treatment on his predisposition to engage in narcotics trafficking. The record belies defendant's contention that he never had this opportunity.
 
 
 20
 Defense counsel wished in addition to show that Hexamer knew that defendant had a drug problem and was enrolled in a rehabilitation program. When asked, however, Hexamer replied in the negative. Love was incompetent to testify as to Hexamer's knowledge. Counsel thus was simply unable to elicit the testimony he wanted although afforded the chance by the district court judge.
 
 
 21
 Finally, the mere fact of defendant's prior cocaine addiction cannot support the defense of entrapment. The evidence of addiction is not enough, by itself, to raise a legitimate question about inducement and lack of predisposition in the absence of "hard evidence" tending to establish the same. See United States v. Molinaro, 877 F.2d 1341, 1350 (7th Cir.1989).
 
 
 22
 Judgment affirmed.
 
 
 
 [1]
 In the parlance of drug dealers, 8 balls refers to 1/8 of an ounce of cocaine
 
 
 [2]
 Defendant's challenge seems to be directed at the sufficiency of the evidence, though the caption to his first argument states that "the district court failed to grant the defendant's motion for a directed verdict." We construe defendant's argument as one addressing sufficiency. It should be clear from the discussion infra that the evidence was sufficient, in addition, to merit jury consideration