**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Richard MOLINARO, Linda Molinaro
& Michael Molinaro,
Defendants–Appellants.**

**Nos. 88–2119, 88–2131 and 88–2792.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 11, 1989.

Decided June 27, 1989.

---

See also, D.C., 683 F.Supp. 205.

Robert W. Pledl, Robert G. LeBell, Robert M. Courtney, Courtney, Pledl & Molter, S.C., Milwaukee, Wis., Thomas J. Royce, Kent R. Carlson, Chicago, Ill., for defendant-appellant.

R. Jeffrey Wagner, Eric J. Klumb, Joseph R. Wall, Asst. U.S. Attys., Milwaukee, Wis., for plaintiff-appellee.

Before BAUER, Chief Judge,
CUDAHY, Circuit Judge, and GRANT,
Senior District Judge.[*]

BAUER, Chief Judge.

Michael Molinaro and his son and daughter, Richard and Linda Molinaro, were each convicted following a jury trial of one count of conspiracy to distribute cocaine in violation of 21 U.S.C. § 846, and one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). Each of the Molinaros challenges the validity of his or her conviction on a number of grounds. For the following reasons, the convictions are affirmed.

## I.

On July 11, 1987, Kerry Raymond, a confidential informant for the United States Drug Enforcement Administration (DEA), was attempting to arrange a drug transaction at a Kenosha, Wisconsin bar. Linda Molinaro, a friend of Raymond's, overheard his efforts and offered to help him find some cocaine. She arranged a meeting between Raymond, herself and her brother Richard for July 14. At the meeting, Richard told Raymond he could get him two to three kilograms of cocaine at a cost of $24,000 to $25,000 per kilo within a week or two. On July 22, Raymond met with Linda and Richard's father, Michael

Molinaro, who informed him that Richard's price quote had been too low and advised Raymond to make future contacts through Linda. Michael and Raymond then met again on July 23 and 29 to discuss the logistics of the transaction. Raymond also met briefly with Richard on August 1. Richard informed Raymond that the cocaine would be arriving in the area shortly and offered to sell him eight or nine ounces immediately. Raymond declined, opting to wait for the larger shipment.

On August 4, Richard informed Raymond that the cocaine had arrived. In a recorded telephone conversation, Richard and Raymond attempted to work out the details of the delivery. Richard agreed to meet Raymond later that night at a Kenosha bar but never appeared. Raymond then went to Linda's house, where Linda showed him three kilos of cocaine wrapped in plastic and kept in a Taco Bell bag. Raymond removed samples and marked the three packages of cocaine and the two agreed to meet the next day to make the exchange. Raymond then called Linda twice during the same night to further discuss the location and time of delivery. During those conversations, which were recorded and admitted into evidence, the two also discussed their dissatisfaction with the way that Richard was handling the deal. Linda assured Raymond that Richard would not be permitted to botch the transaction. Linda also described the history of her father's involvement in the conspiracy, explaining to Raymond that in the future he would only have to deal with Michael and her.

On the following day, Michael dropped his car off at Linda's house and left in her car. Linda then went in Michael's car to a Burger King parking lot to meet Raymond. In the parking lot, Raymond got into the car with Linda, who showed him the Taco Bell bag containing the three packages of cocaine he had marked the night before. Raymond then got out of the car, purportedly to get the money, and gave the prear-

[*] Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

ranged arrest signal. When Linda attempted to drive off, one of the officers shot out the tires of her car and she was placed under arrest.

Michael Molinaro was arrested in the vicinity of Linda's house later the same day. A search of his wallet produced several slips of paper with incriminating evidence. One slip contained the name and two telephone numbers of the family's alleged Florida source of supply. Another slip contained the combination to a floor safe located in Richard's basement. Officers later searched Richard's house pursuant to a warrant and discovered various drug paraphernalia, drug packaging materials and a triple beam scale in the safe. Agents also found a bottle of inositol, a common cutting agent for cocaine, hidden in a basement closet. Richard surrendered to the authorities two days later. His fingerprints, as well as Linda's, were discovered on the Taco Bell bag containing the cocaine.

The Molinaros were tried by a jury between March 21 and March 25, 1988. All three were found guilty of one count of conspiracy to distribute cocaine and one count of possession with intent to distribute. Michael and Linda were sentenced to five years incarceration on each count, the sentences to run concurrently. Richard received eight years on each count, also imposed concurrently. Each now appeals, alleging that numerous errors tainted their convictions.

## II.

### A.

Michael Molinaro's first argument on appeal is that the trial court erred in admitting into evidence tapes and transcripts of

the conversations Raymond had with Richard and Linda on the night before the planned delivery. In one conversation, Richard and Raymond discussed the impending transaction, including Richard's hesitance to meet Raymond's connections at the time of delivery. Richard agreed to meet Raymond later that night at a Kenosha pub. In two later conversations, Raymond and Linda discussed the details of the pending transaction. The two also discussed at length the fact that Richard was gumming up the works; Raymond told Linda that he didn't trust Richard and Linda assured him repeatedly that both she and her father had agreed to wash their hands of Richard. She promised Raymond that Richard would have no further involvement in the deal at hand or in any future dealings with Raymond. Linda also described to Raymond how her father had become involved in the conspiracy in the first place, and how he had initially needed Richard in order to learn the ropes of the business. Since her father had gained some experience, however, Linda assured Raymond that Richard was out of the picture.

■ The trial court admitted all of the conversations between Raymond, Richard and Linda into evidence under the rule of evidence which provides that a statement is not hearsay if it is "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E). Michael Molinaro alleges that the court erred in admitting those statements because they did not satisfy the requirement that the statements were made in furtherance of the conspiracy.[1] Instead, he argues that the state-

---

1. In his brief, Michael also claims that the statements should not have been admitted because they did not satisfy the other requirements of Rule 801(d)(2)(E), namely, that Michael was a member of the conspiracy and that the statements were made during the course of the conspiracy. Counsel also argues that the statements were improper evidence of prior bad acts not admissible under Fed.R.Evid. 404(b). Our review of the record reveals that none of these objections were raised at trial; instead, the admissibility of the statements was only challenged on the grounds that they had not been

made in furtherance of the conspiracy. In fact, Richard's attorney admitted that the statements had been made in the course of the conspiracy, and Michael's attorney did not disagree. Thus, counsel failed to preserve these specific objections for review. See *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988) (neither general objection to the evidence nor specific objection on other grounds preserves issue). In light of the fact that the trial court was not given an opportunity to consider either of these arguments, we will not consider them for the first time on appeal, unless the admission of the

ments were "idle chatter" or mere narrative of past events that did nothing to further the goals of the conspiracy.

We review a trial court's determination that certain statements serve to further conspiratorial ends under the "clearly erroneous" standard. *United States v. Shoffner*, 826 F.2d 619, 627 (7th Cir.1987), *cert. denied, Stange v. United States*, — U.S. ——, 108 S.Ct. 356, 98 L.Ed.2d 381 (1987). If some reasonable basis exists for concluding that the statements at issue furthered the conspiracy, we will not disturb the trial court's ruling on that point. *Id.* at 628. Here, the conversation between Raymond and Richard showed an attempt by the two to iron out their differences of opinion regarding the method of delivery. With regard to the discussions between Raymond and Linda, the judge stated that he interpreted those conversations as indicating to Raymond precisely who among the Molinaros he could trust (and who he could not). This certainly appears to be a reasonable interpretation of those discussions; Raymond had indicated extreme displeasure with the way Richard was handling matters. Linda assured him that Richard was no longer in charge and explained the history of her father's involvement in order to convince Raymond that she and Michael were fully capable of handling matters without Richard. We have in the past held that conversations dealing "with such topics as selling [drugs], arranging delivery and payment, reassuring each other of trustworthiness, and discussing the current status of the conspiracy" were clearly made in furtherance of the conspiracy. *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir.1988). In this case, Richard's conversation with Raymond was an attempt to iron out disputed details of the method of delivery and payment. Linda's reassurances to Raymond were, on the other hand, designed primarily to control the damage that Richard had apparently done to the conspiracy's working relationship by insisting on terms unacceptable to Raymond. Under the circumstances, we cannot conclude that the trial court erred in finding that all three conversations were made in furtherance of the conspiracy.

## B.

Michael next argues that the trial court's admission of the drug paraphernalia found in Richard's safe served to impermissibly amend the indictment against him. The evidence admitted actually falls into two distinct categories. The first type of paraphernalia included a triple beam scale, folds for packaging small quantities of cocaine, and a bottle of inositol. According to Molinaro, the scale, folds, and inositol evidenced a street level distribution of cocaine whereas the conspiracy charged in count one of the indictment was limited to large scale distribution of three kilograms. In addition, other items found in the safe—a smoking pipe, a razor blade, a mirror and rolling papers—were also introduced into evidence over Michael Molinaro's objection. He argues that this paraphernalia related solely to Richard's personal narcotics use and therefore was not relevant to either charge.

Although Michael has chosen to frame a portion of this argument in terms of whether the introduction of the evidence impermissibly amended the indictment, we view the issue as presenting a straight-forward evidentiary question. That is, whether either of the two categories of evidence were relevant to proving any of the elements of the offenses charged in the indictment. Counsel's only objection to the evidence at trial was on grounds of relevance. The district court ruled that all of the drug paraphernalia found, even those items relating solely to Richard's personal use, were relevant to proving the conspiracy to distribute narcotics alleged in count one. We review this determination only for an abuse of discretion. *United States v. Moore*, 845 F.2d 683, 687 (7th Cir.1988).

With regard to the scale, packaging materials and inositol, there is no doubt

evidence was plain error. *Id.* Here, Michael has not demonstrated that he probably would have been acquitted had the conversations not been admitted into evidence and thus has not demonstrated plain error.

that these items are commonly recognized "tools of the trade" for narcotics distribution and therefore were relevant to proving the conspiracy to distribute charged in count one. *See, e.g., United States v. Savinovich*, 845 F.2d 834, 837 (9th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 369, 102 L.Ed.2d 358 (1988) (scales relevant to prove intent to distribute); *United States v. Payne*, 805 F.2d 1062, 1065 (D.C.Cir.1986) (scales and zip-lock bags squarely relevant on intent to distribute). There was no abuse of discretion in admitting these items as evidence of the conspiracy charged in count one, which alleged that the Molinaros "did knowingly and willfully conspire with persons known and unknown to the grand jury to intentionally and knowingly distribute cocaine," without reference to any specific quantity or any particularized "level" of distribution.

■ The admission of the items relating to Richard's personal use of narcotics is slightly more troubling, for it is not in any way probative of intent to distribute narcotics. *See United States v. Monzon*, 869 F.2d 338, 343–44 (7th Cir.1989) (evidence of marijuana butts found in defendant's car and that he sported a long pinky fingernail common among narcotics users and dealers not probative of intent to distribute). Any error in admitting this evidence is harmless, however, if the remaining untainted evidence is overwhelming or if the error had such slight effect that it could not have swayed the jury. *Id.* at 345. We do not think that evidence of Richard's drug use could have in any way affected the jury's deliberations with regard to Michael Molinaro and therefore find that any error in this regard was harmless.

## C.

Michael Molinaro's final argument on appeal is that the district court erred in denying his motion to suppress the evidence seized from his wallet at the time of his arrest. The testimony at the hearing on the motion to suppress established that

shortly after Molinaro was apprehended on authority of a federal arrest warrant and placed in the back seat of a DEA vehicle, one of the federal agents involved took Molinaro's wallet, spread its contents out on the trunk of the car. Upon discovering the slips of paper containing the name and phone numbers of the family's alleged Florida source and the combination to Richard's floor safe the agent remarked to a fellow agent, "here is what we are looking for." [2] The magistrate who presided at the hearing on the motion found that Molinaro was under arrest at the time of the search and concluded that the search was a valid one incident to arrest. The district court subsequently adopted the magistrate's findings of fact and conclusions of law on this matter and denied Molinaro's motion to suppress.

■ Although Molinaro takes issue with the magistrate's finding that he was under arrest at the time agents searched his wallet, we are bound by that factual determination absent a showing of clear error. *United States v. Grier*, 866 F.2d 908, 935 (7th Cir.1989); *United States v. Goudy*, 792 F.2d 664, 668 (7th Cir.1986). Regardless of whose version of the events the magistrate believed, under either scenario Molinaro had been stopped on authority of a federal arrest warrant and was seated in the back of a DEA vehicle at the time his wallet was searched. The magistrate's determination that Molinaro was "under arrest" at the time is not clearly erroneous.

■ Molinaro nonetheless argues that even if his wallet was taken after he was placed under arrest, agents did not have the authority to search its contents without first obtaining a warrant. This argument fails in light of clear authority to the contrary. The Supreme Court has upheld warrantless searches of an arrestee's person, including personal property contained in his pockets, as a search incident to arrest. *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Nu-

---

**2.** Although there was conflicting testimony regarding precisely when and where Molinaro's wallet was searched, it is clear that the search

was conducted within 10 to 20 minutes of Molinaro's apprehension by Kenosha police.

merous courts have upheld the search of a defendant's wallet under this exception. *See e.g., United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir.), *cert. denied, Crespo–Diaz v. United States*, 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 303 (1985) (valid search incident to arrest extends to contents of wallet found on defendant); *United States v. McEachern*, 675 F.2d 618, 622 (4th Cir.1982) (same); *United States v. Passaro*, 624 F.2d 938, 943 (9th Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 925, 66 L.Ed.2d 842 (1981) (same); *United States v. Gay*, 623 F.2d 673, 675 (10th Cir.), *cert. denied*, 449 U.S. 957, 101 S.Ct. 366, 66 L.Ed.2d 222 (1980) (same); *United States v. Castro*, 596 F.2d 674, 677 (5th Cir.), *cert. denied*, 444 U.S. 963, 100 S.Ct. 448, 62 L.Ed.2d 375 (1979) (same). Although this circuit has not had an opportunity to rule on precisely this issue, we have indicated our agreement with those cases where the search of an arrestee's wallet was found to be a reasonable one under Fourth Amendment standards. *United States v. Garcia*, 605 F.2d 349, 355, 359 (7th Cir.1979), *cert. denied*, 446 U.S. 984, 100 S.Ct. 2966, 64 L.Ed.2d 841 (1980). In *Garcia*, we specifically rejected the argument that the Fourth Amendment prohibits the immediate search of the contents of an arrestee's wallet, purse or shoulder bag as "plainly contrary to the law governing searches incident to arrest." *Id.* at 355.[3] Therefore, we agree with the magistrate's holding that the search of Michael Molinaro's wallet for evidence that might otherwise have been destroyed was a valid search incident to his arrest.

### III.

■ Richard Molinaro challenges the sufficiency of the evidence supporting his conviction on either count. This attack on the sufficiency of the evidence sustaining the conspiracy conviction invites us to reexamine each piece of evidence and, in the

process, to reevaluate that evidence in a manner that we, as a court of review, cannot do. For instance, Molinaro discounts the significance of Kerry Raymond's testimony that he twice met with Richard to arrange the cocaine transaction by reminding us that this evidence "is totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug-dealing, paid government informant." This argument is wasted on an appellate court; Molinaro thoroughly attacked Raymond's credibility at trial and the jury, which is the only entity entitled to make such credibility determinations, apparently decided to believe Raymond's testimony despite his many character flaws. *United States v. Angulo*, 864 F.2d 504, 508 (7th Cir.1988).

■ Molinaro also argues that even if the jury did believe Raymond's account of his meetings with Richard, those meetings at most established a potential "buyer-seller" relationship between Richard and Raymond. It is true that a simple agreement by one person to buy what another agrees to sell does not, in and of itself, establish a conspiracy. *United States v. Koenig*, 856 F.2d 843, 854 (7th Cir.1988). This is because the crime of conspiracy involves a concert of action between two or more persons for a common purpose. *Id.* In this case, however, there was ample evidence that Richard was not alone in his efforts to supply Raymond with cocaine, but instead that he was acting in concert with his father and sister, each of whom Raymond also met and spoke with regarding the same transaction. The conspiracy charge was supported by proof of the combined efforts of the Molinaro family; it did not rest solely upon Richard's agreement to sell to Raymond.

■ Richard's challenge to the sufficiency of the bulk of the remaining evidence of the conspiracy also misses the mark. He continues his analysis with a piecemeal con-

---

**3.** In fact, even the dissenting judge in *Garcia* would apparently agree that an officer may search the contents of an arrestee's wallet under the search incident to arrest exception. The dissent noted that "[w]arrantless searches of [items found in an arrestee's pockets] after they

come in police custody can be characterized as searches of the arrestee's person because they do not involve any greater reduction in the arrestee's expectations of privacy than that caused by the arrest itself." 605 F.2d at 364 (Swygert, J., dissenting).

sideration of each remaining item of evidence—the recorded phone conversation of Raymond's call to him the night before the delivery; the records of phone calls between his residence, the alleged Florida source of supply and his father's house; the drug paraphernalia found in his basement floor safe; and his fingerprints on the Taco Bell bag containing the cocaine.[4] He argues that none of this evidence served to establish his membership in the conspiracy because in his testimony at trial he offered an innocent explanation for all of it. In essence, Molinaro is asking this court to consider the evidence in a light most favorable to him. *See United States v. Perlaza,* 818 F.2d 1354, 1359 (7th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 176, 98 L.Ed.2d 130 (1987). Though the jury could conceivably have drawn from the evidence the inferences which Molinaro now urges upon us, it apparently did not do so. Our standard of review requires us to consider the evidence and the reasonable inferences to be drawn from it in favor of the government. *United States v. Douglas,* 874 F.2d 1145, 1150 (7th Cir.1989). In doing so, we keep in mind that the government was not required to "exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt." *Id.* at 1151 (quoting *United States v. Koenig,* 856 F.2d at 854). *See also United States v. Zanin,* 831 F.2d 740, 745 (7th Cir.1987) ("The existence of an innocent explanation does not foreclose a jury from finding guilt beyond a reasonable doubt."). We conclude that the jury could reasonably have inferred from all of the evidence presented that Richard Molinaro knew of the conspiracy to distribute narcotics and that he intended to join and associate himself with its criminal design and purpose. *United*

*States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984).

Molinaro also challenges the sufficiency of the evidence supporting his conviction for possession with intent to deliver. The jury was instructed that it could find Richard guilty on this count under the alternative theories of constructive possession or aiding and abetting.[5] We conclude that there was sufficient evidence to convict on either theory. To prove constructive possession in narcotics cases, the government must show that the defendant had the ability to exercise control over the narcotics, that is, the power to possess them. *United States v. Rodriguez,* 831 F.2d 162, 167 (7th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1234, 99 L.Ed.2d 433 (1988). Evidence which establishes that the defendant is one of a group of conspirators who jointly control the narcotics is sufficient to prove constructive possession. *See United States v. Manzella,* 791 F.2d 1263, 1266 (7th Cir.1986). In this case, the evidence established that Richard was responsible in great part for arranging the transaction with Raymond, that calls were placed to the family's alleged Florida source of supply from Richard's house, and that Richard was the one who ultimately informed Raymond that the cocaine had arrived in the area. He then discussed the planned time and place for delivery with Raymond and, though Richard was not actually present when the transaction took place, his fingerprints were found on the Taco Bell bag that contained the three kilograms of cocaine. Portions of Linda's recorded conversations with Raymond suggested that Richard had left the cocaine with her earlier that evening and further indicated that Richard was entitled to some of the money the transaction would bring. Even if the government's evidence did not establish

---

**4.** Richard also challenges the trial court's admission of the recorded conversations between Linda and Raymond on the grounds that they were not made in furtherance of the conspiracy as is required by Fed.R.Evid. 801(d)(2)(E). As we have already stated in our discussion of Michael Molinaro's conviction, however, the district court's determination that the statements did further the conspiracy was not clearly erroneous. Thus, the statements by Linda were admis-

sible and provided additional evidence of Richard's involvement in the conspiracy.

**5.** The jury was also instructed that it could find Richard guilty of possession on the basis of co-conspirator liability. Molinaro does not challenge the propriety of the instruction or the sufficiency of the evidence with regard to this theory.

that Richard actually possessed the cocaine at one time or another, (which the fingerprint evidence certainly suggests that he did), it clearly supported the inference that Richard had the ability to exercise control over the cocaine and thus established constructive possession. The same evidence also established that Richard both intended to assist and in fact did assist Linda and Michael with their possession of cocaine, which is sufficient to sustain his conviction on the theory of aiding and abetting. *Rodriguez*, 831 F.2d at 167. Thus, we conclude that there was sufficient evidence for the jury to conclude that Richard Molinaro was guilty of the possession charge.

### IV.

Linda Molinaro claims that the district court committed reversible error by refusing to instruct the jury on the defense of entrapment. To be entitled to such an instruction, a defendant must demonstrate that there was sufficient evidence for a reasonable jury to find that the government induced her to commit the crime and that she was not predisposed to engage in the criminal conduct. *United States v. Fusko*, 869 F.2d 1048, 1051–52 (7th Cir. 1989). To meet this burden, the defendant need not testify or produce witnesses; evidence of government inducement and lack of predisposition on the defendant's part may be revealed by the government's own witnesses. *United States v. Gunter*, 741 F.2d 151, 153 (7th Cir.1984); *United States v. Thoma*, 726 F.2d 1191, 1197 (7th Cir.), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). *See also Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (successful defense of entrapment based solely on government's witnesses). In the end, however, "there must be some hard evidence in the record which, if believed by a rational juror, would suffice to create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he [or she] was not predisposed to commit." *United States v. Rodriguez*, 858 F.2d 809, 814 (1st Cir.1988).

In examining the element of predisposition to commit the offense, this court has looked at a variety of factors, including: 1) the character or reputation of the defendant; 2) whether the suggestion of the criminal activity was originally made by the government; 3) whether the defendant evidenced reluctance to commit the offense and was overcome by government persuasion; and 4) the nature of the inducement or persuasion offered by the government. *Fusko*, 869 F.2d at 1052 (citing cases). Though none of these factors, standing alone, is determinative on the issue of predisposition, we have repeatedly recognized that the key to the equation is whether the defendant was reluctant to commit the offense. *Id.*

Our review of the record reveals no evidence that Linda was reluctant to engage in the instant narcotics transaction. The only evidence regarding the inception of this scheme came from the testimony of Kerry Raymond, the government's informant. He testified that on July 11, 1987 he was in a Kenosha bar making phone calls in an attempt to purchase narcotics. According to Raymond, Linda overheard his efforts and approached him with an offer to help him find some cocaine. Within three days, she had arranged a meeting between Raymond and her brother Richard, where Richard agreed to locate two or three kilograms of cocaine. She then arranged numerous other meetings between Raymond and her father to work out the details of the transaction, let Raymond examine the cocaine in her home on the night before the planned delivery, and personally delivered the cocaine to Raymond the next day. There was absolutely no evidence of record to suggest that the initial contact between Raymond and Linda occurred any differently than Raymond had testified. Though counsel for all three defendants thoroughly cross-examined Raymond regarding his first meeting with Linda, they were unable to unearth a single inconsistency in his testimony. Thus, Linda could not point to any evidence from which a reasonable juror could infer reluctance on her part to engage in the narcotics transaction.

Linda's counsel makes much of the fact that Kerry Raymond's less than stellar character raised a serious question of fact as to his credibility as a witness. Counsel reminds us that Raymond was a paid government informant with a history of felony narcotics convictions who admitted he had lied under oath during a divorce proceeding and admitted he knew that Linda had at one time been prepared to testify against him in a prosecution for assault. Furthermore, Molinaro argues that Raymond's testimony regarding his initial contact with Linda was uncorroborated and not recounted in any DEA report of Raymond's activities. Counsel argues that this evidence, coupled with the fact that Linda Molinaro was an unemployed, unwed mother with a cocaine habit and severe health problems, for whom Raymond had in the past provided free cocaine, was enough to raise a legitimate question regarding government inducement and lack of predisposition. It is not. To conclude that these facts demonstrate any reluctance on Linda's part or improper inducement on Raymond's part would require a court to imagine a scenario wholly unsubstantiated by any concrete evidence in the record. Because Linda Molinaro could not point to any evidence in the record from which a juror could reasonably infer government inducement and a lack of predisposition on her part, the district court did not err in refusing to instruct the jury on the defense of entrapment.

## V.

For all of the foregoing reasons, the convictions of the defendants are affirmed.