UNITED STATES of America, Plaintiff,

v.

Michael ALEXANDER, Defendant.

No. 1:90CR0007.

United States District Court,
N.D. Ohio, E.D.

June 21, 1990.

Mark McClain, Asst. U.S. Atty., for plaintiff.

David A. Snow, Geoffrey M. Schumer, James R. Willis, Cleveland, Ohio, for defendant.

## MEMORANDUM AND ORDER

ANN ALDRICH, District Judge.

Michael Alexander has moved, pursuant to Federal Rules of Criminal Procedure 12(b)(3) and 41(e), for the suppression of evidence seized incident to his arrest and upon search of his home, and for the return of certain of this evidence. The government opposes this motion. A hearing was held on May 10 and May 11, 1990, at which the Court received evidence and heard the testimony of witnesses. Upon consideration, the Court finds that Alexander's suppression motion is not well-taken with respect to the evidence seized incident to his arrest. However, the Court finds that the motion is well-taken with respect to the evidence seized incident to the search of his residence, and that said evidence may not

be used against Alexander at trial. The Court defers ruling at this time on Alexander's Rule 41(e) motion. As required by Federal Rule of Criminal Procedure 12(e), the following constitutes the Court's findings of fact and conclusions of law.

### I.

Upon consideration of the testimony and the other evidence submitted, the Court makes the following findings of fact.

Michael Alexander, Jr., is a 26 year old black male. On December 8, 1989, City of Cleveland police officers White and Carosielli were parked in an unmarked car on East 102nd Avenue near St. Clair. They heard and then saw a new model blue Chevy Blazer turn from St. Clair onto East 102nd at a high rate of speed. The Blazer came close to colliding with their parked car, as it drove past them and sped down the street. They activated their siren and the high beams of their headlights and commenced pursuit.

Alexander was driving the Blazer. He attempted to evade them, going block to block, turning frequently and maintaining a high speed. Upon finding himself in a dead end street near Glenview Park, he abandoned the Blazer, leaving the motor running, and fled on foot over a chain-link fence, down an embankment, and across the park, carrying a white plastic grocery-type bag in his right hand. Detective Carosielli pursued him on foot. Alexander remained in Carosielli's sight, except briefly when he jumped down the embankment. Carosielli saw Alexander drop the bag, which Carosielli retrieved.

Meanwhile, Officer White drove the squad car around to the opposite side of the park, exited the car, and approached Alexander on foot. White tackled Alexander and, after a struggle, handcuffed his hands behind his back. During this struggle, Alexander suffered various painful but not medically serious injuries including a broken tooth and nose, and a minor cut on his head. The officers then read him his constitutional rights from a department-issue *Miranda* card. The Court credits Alexander's testimony that, at this time, he requested medical treatment and an opportunity to telephone his father or his attorney.

The officers discovered that the plastic bag contained what appeared, and was later proved, to be approximately one and one-half pounds of cocaine. They returned to Alexander's Blazer, where back-up police officers joined them. Upon searching Alexander, they discovered $1,260 in cash and a paging device. The Blazer's engine was turned off, and a key ring removed from the ignition. The ignition key was left with other officers and the truck, and the rest of the keys were returned to Alexander. Alexander was read his *Miranda* rights a second time.

Alexander refused to divulge his address. The officers searched through his wallet and found his driver's license, which listed his address as 14422 St. Clair in Cleveland, Ohio, and an insurance card which listed his address as 235 East 235th Street, Euclid, Ohio.

The City of Cleveland Police Department policies and procedures require booking within the district of an arrest and require that transportation "to the place of detention [be effected] without unnecessary delay and by the most direct route."[1] Not-

---

1. The City of Cleveland Police Booking Procedures, dated August 2, 1979, provide in relevant part:

 All persons arrested shall be booked at the District Headquarters in which the location of arrest is situated. Third District prisoners shall be booked directly at the Central Prison Unit.
 (Deft. Ex. 7).
 Further, the City of Cleveland Police Manual of Rules provides in pertinent part:

 16.02 Prisoners shall be conveyed to the place of detention without unnecessary delay and by the most direct route.
 \* \* \* \* \*
 16.09 Officers shall strictly adhere to laws and departmental regulations which determine time restrictions on prisoner detention. (Deft. Ex. 6).
 Departmental procedures also require that arresting officers assess the medical condition of an arrestee, and provide access to medical care if necessary:

withstanding these policies, Detectives White and Carosielli, with Alexander handcuffed in the back seat, drove past the closest Cleveland police station and proceeded to 14422 St. Clair. Upon arrival at that address, they found it to be a vacant building. The officers again checked Alexander's wallet and decided to investigate the 235 East 235th Street, Euclid address. At that point, Alexander became anxious and attempted to convince the detectives that he did not reside at that address and used it solely for insurance purposes.

Notwithstanding provisions of Ohio law and the Rules of Criminal Procedure requiring prompt arraignment following a warrantless arrest and restricting police to their own jurisdictions except in unusual circumstances,[2] the officers in this case decided to leave the city of Cleveland, and go into the city of Euclid, taking Alexander with them, to verify whether the East 235th Street address was in fact Alexander's. They made a "courtesy" telephone call to the Euclid police and informed them that they intended to go into Euclid to investigate an address there. They invited the Euclid police to meet them at a nearby shopping center and accompany them. They then proceeded to Interstate 90, and across the city boundary, taking Alexander with them, and met the Euclid officers, who directed them to 235 East 235th Street.

Upon arrival, they stationed some officers at the back entrance of a townhouse apartment, and proceeded to the front entrance. Cleveland police officer Sgt. Gercar, who by now had joined a cavalcade of some three unmarked Cleveland police cars to Euclid, took Alexander's keys and tried them, one by one, until he found keys matching the locks, and opened the front door. Gercar, Carosielli and White, among others, entered the premises. Carosielli testified that the lights were out, that he used his flashlight to look around, and that he spied a pile of mail with a letter on top, in plain view, addressed to Alexander. He stated that, at that point, he determined that they were in fact in Alexander's residence. On the other hand, Gercar testified that the lights were on, that he looked in the window but could not see anyone in-

---

Prior to transporting prisoners to a jail facility, arresting officers shall determine whether the prisoner is suffering from an acute ... condition that would warrant medical attention prior to confinement.

If an evaluation of the behavior of the prisoner, alone or in combination with information obtained from the prisoner or others, indicates that the prisoner is in need of medical attention, the prisoner shall be taken to the nearest hospital emergency room for treatment prior to being lodged in jail.

City of Cleveland General Police Order (January 9, 1985) (Deft. Ex. 5).

**2.** In relevant part, Section 2935.03 of the Ohio Revised Code, "Officer's power to arrest without warrant; pursuit outside jurisdiction," provides:

(B) When there is reasonable ground to believe that ... a felony drug abuse offense ... has been committed within the limits of the political subdivision ... in which the peace officer is ... employed ... [a] police officer ... may arrest and detain until a warrant can be obtained any person whom he has reasonable cause to believe is guilty of the violation.

 * * * * * *

(D) If a ... police officer ... is authorized by division ... (B) of this section to arrest and detain, within the limits of the political sub-division ... in which he is ... employed

..., a person until a warrant can be obtained, the peace officer may, outside the limits of the political subdivision ... in which he is ... employed ..., pursue, arrest, and detain that person until a warrant can be obtained *if all of the following apply:*

(1) The pursuit takes place without unreasonable delay after the offense is committed;

(2) The pursuit is initiated within the limits of the political subdivision ... in which the peace officer is ... employed ...;

(3) The offense involved is a felony....
(emphasis added).

In relevant part, Section 2935.05, "Affidavit filed in case of arrest without warrant," provides:

When a person named in section 2935.03 of the Revised Code has arrested a person without a warrant, he shall, *without unnecessary delay,* take the person arrested before a court or magistrate having jurisdiction of the offense, and shall file or cause to be filed an affidavit describing the offense for which the person was arrested.
(emphasis added).

In relevant part, Rule 4 of the Ohio Rules of Criminal Procedure provides:

(2) Arrest without warrant. Where a person is arrested without a warrant the arresting officer shall ... bring the arrested person without unnecessary delay before a court having jurisdiction of the offense ...

side. He first said he knew it was Alexander's house when he was inside and he saw mail addressed to Alexander and a picture of Alexander on the wall. He later testified that he had realized they were at Alexander's residence when the key fit the lock. Contradicting Gercar, White testified that the lights were off, and that he knew it was Alexander's house when they got to the front door, because Alexander admitted that he lived there. However, neither of the other officers testified that Alexander made such a statement and Alexander adamantly denied it. In light of that testimony, and the fact that Alexander and all three officers agree that Alexander steadfastly refused his consent to a search of the house, this Court does not credit Officer White's testimony.

All three officers stated that, due to the large amount of cocaine recovered in the park, they had already planned to get a warrant before they went in and secured the premises. They all testified that they believed more drugs would be found at Alexander's residence, and that the drugs would be at risk of being removed if not seized promptly.

During this initial period, Alexander remained outside, handcuffed and in the custody of officers whose names he does not recall. He testified that Gercar, Carosielli, White and some others were inside for between three and six minutes. After they announced that the premises were secured, Alexander was taken inside and seated on the couch in the living room. He testified that the officers had already started an aggressive and thorough search of the house, including moving furniture. The officers all testified to the contrary that they had done nothing more than turn on the lights and walk through the house to ensure that no one was present, glance over a few pieces of mail and notice a photograph or two. They stated that they all remained in the living room, watching television, while Carosielli and White went to procure a search warrant.

Officer White drafted both the affidavit stating the grounds for the warrant, and the warrant itself at approximately 12:00 a.m.[3] Detectives White and Carosielli presented the affidavit and warrant to Judge Jones of the Cuyahoga County Court of Common Pleas sometime after midnight. Judge Jones reviewed the affidavit and signed the warrant.

According to the officers, they then made a copy of the signed warrant, returned to 235 East 235th Street, and

---

**3.** The affidavit alleges the following facts:

1. In the past members of the Cleveland Police Narcotic Unit have been made aware of narcotics being transported in a blue Chevy Blazer bearing Ohio Plate 835THP.

2. In the evening hours of December 8, 1989 [Detectives White and Carosielli] were at the intersection of E. 102 and St. Clair when they observed the Blazer operating at a high rate of speed and in an erratic [sic]. Officers recognized the auto and attempted to pull it over resulting in a prolonged pursuit throughout the streets of the east side ...

3. The male was extremely evasive about providing personal information on himself and gave an address on St. Clair. We went there to verify it and found it to be a vacant building. On his person was found an insurance car[d] with the address of the above described premises [at 235 East 235th Street, Euclid, Ohio] on it. [W]hen asked about it the male denied that he lived there stating that he only used it for insurance purposes. We went to the address with the purposes of identifying the occupants and the address of our suspect. At the address he stated that he did live there but refused to sign a consent search. Due to the large amount of cocaine taken from the male we felt that it was imperative to secure the premises to prevent any other cocaine from leaving the residence. The male was in possession of the keys to the house and the premises was [sic] secured.

4. Affiant believes based on his training and experience, that based on the incident that occurred and the males [sic] evasiveness concerning his residence that there is more cocaine in the residence and that if the premises is [sic] not searched it will be taken from the residence.

The warrant authorizes a search for:

Cocaine and other narcotic drugs and/or controlled substances, instruments and paraphernalia used in the taking of drugs and/or preparation of illegal drugs for sale, use or shipment, records of illegal transactions, articles of personal property, papers and documents tending to establish the identity of persons in control of the premises, contraband, including but not limited to money and weapons being illegally possessed therein, any and all evidence pertaining to violations of the Drug Laws of the State of Ohio ...

presented the copy to Alexander. Also according to the officers, they then began their search of the residence.

They found and seized more than one quarter pound of cocaine, a loaded semi-automatic weapon, ammunition, an unspecified amount of marijuana, and $72,660 in cash. They also seized two mobile telephones, a second paging device, a video cassette recorder, a typewriter, two watches and assorted pieces of jewelry, a photograph album, and various personal papers.

Thereafter, Alexander was transported, past at least two precinct police stations, to the Justice Center in downtown Cleveland. He was booked at 3:30 a.m. on December 9, 1989 and was issued two traffic citations. His booking sheet recites discovery of the following evidence: "tools/instruments, photographs, weapon, shell cs./bullets, documents, drugs/parapha., vehicle." The sheet also states the "compete offense/incident title" as "Violation of state drug law/arrest/contraband seized/gun confiscation." It includes a request for forfeiture of the Blazer and the money, and records seizure of the contraband drugs and unlicensed weapon.

Upon arrival at the Justice Center, Alexander requested medical treatment, or to be taken to a hospital. At approximately 2:10 p.m. that afternoon, he was transported to Fairview General Hospital where he was diagnosed as suffering from a nasal fracture, fractured tooth, lacerations on the inside of his mouth, and abrasions of the wrists and head. His head wound was cleansed with a disinfectant, and he was prescribed a disinfecting oral rinse and given a dental appointment.

## II.

Alexander challenges the legality of his arrest, and demands suppression of the evidence obtained incident to that arrest. He contends that he had been driving the Blazer in a lawful manner and that, contrary to their assertions, the police did not have prior information implicating that vehicle in drug trafficking. He thus urges the Court to conclude that Detectives White and Carosielli lacked the constitutionally required basis for stopping him, and did so due to arbitrariness and racial animus.

■ The fourth amendment applies to persons travelling the streets by foot or motor vehicle and requires that law enforcement personnel have a reasonable suspicion, based on specific and articulable facts, of criminality before they may stop, or seize, a person for questioning or a search. *Michigan v. Long*, 463 U.S. 1032, 1049–1050, 103 S.Ct. 3469, 3480–3481, 77 L.Ed.2d 1201 (1983); *United States v. Cortez*, 449 U.S. 411, 417–18, 101 S.Ct. 690, 694–95, 66 L.Ed.2d 621 (1981); *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

■ At the same time, however, police officers are authorized to stop vehicles observed violating traffic laws. *E.g., New York v. Class*, 475 U.S. 106, 108, 106 S.Ct. 960, 963, 89 L.Ed.2d 81 (1986) (vehicle stopped for cracked windshield and speeding); *New York v. Belton*, 453 U.S. 454, 455, 101 S.Ct. 2860, 2861, 69 L.Ed.2d 768 (1981) (vehicle stopped for speeding). Moreover, under Ohio Revised Code § 2935.03(A), they are not only authorized, but directed, to do so. *Id. See also* O.R.C. §§ 4511.20, 4511.202 and 4511.21; Cleveland City Ordinance §§ 2321.331 and 433.-02(A).

■ Despite the discrepancy between the testimony of Carosielli and White as to how close Alexander came to their parked car, the Court found credible their testimony that they noticed Alexander because of the manner in which he was driving. Their testimony did not substantiate the allegations in White's affidavit that the officers had had prior information linking this particular Blazer to drug traffic. However, it did not find that this inconsistency so impugned their version of events as to require acceptance of the version offered by Michael Alexander, Jr. and Sr., which the Court found neither coherent nor persuasive.[4]

---

**4.** In his brief, Alexander claimed that "the evidence here will show ... that the particular

Although the officers were engaged in undercover narcotics work, they were not stripped of their authority to enforce traffic laws. Carosielli and White were indeed authorized to pursue anyone they perceived as a flagrant traffic offender, and the fourth amendment provides Alexander no shelter from such a pursuit. Alexander admitted his attempt to evade them. Moreover, his testimony that he heard no sirens and saw no flashing lights lacked all plausibility.

Alexander does not dispute that he waived any fourth amendment rights he may have had in the white plastic bag at the time he abandoned it. *Abel v. United States*, 362 U.S. 217, 240–41, 80 S.Ct. 683, 697–98, 4 L.Ed.2d 668 (1960); *United States v. Knox*, 839 F.2d 285, 293–94 (6th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989). *See also United States v. Thomas*, 864 F.2d 843 (D.C.Cir.1989). Alexander's motion for suppression of the evidence obtained incident to his arrest is denied.

### III.

■ Alexander asserts that the search of his wallet, which revealed the insurance card containing his address, was improper. Police officers are authorized to conduct a search of a suspect's person, including the person's pockets, incident to a lawful arrest. *Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). This search may include the contents of the person's wallet. *E.g., United States v. Molinaro*, 877 F.2d 1341, 1347 (7th Cir.1989); *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir.), *cert. denied sub nom. Crespo–Diaz v. United States*, 474 U.S. 952, 106 S.Ct. 320, 88 L.Ed.2d 303

(1985). Therefore, the Court rejects Alexander's argument on this point.

### IV.

Alexander contends that the officers searched his house prior to obtaining a warrant and absent exigent circumstances, in violation of the fourth amendment's prohibition against warrantless searches. He contends further that the warrant subsequently obtained was invalid because it was not supported by probable cause, again, in violation of the fourth amendment.[5]

#### A. The warrantless entry

■ The Court considers first whether the warrantless entry into Alexander's home was "unreasonable" in fourth amendment terms. It has long been hornbook constitutional law that warrantless searches of private residences are presumptively unreasonable. *United States v. Ross*, 456 U.S. 798, 824–25, 102 S.Ct. 2157, 2172–73, 72 L.Ed.2d 572 (1982), *cited in Horton v. California*, —— U.S. ——, ——, 110 S.Ct. 2301, 2306 n. 4, 110 L.Ed.2d 112 (1990); *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980); *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978).

■ Only in rare, "exigent," circumstances is the warrant requirement to be excused. *E.g., United States v. Santana*, 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300 (1976) (hot pursuit of a fleeing felon); *Schmerber v. California*, 384 U.S. 757, 770–71, 86 S.Ct. 1826, 1835–36, 16 L.Ed.2d 908 (1966) (threat of destruction of evidence); *United States v. Radka*,

officers here involved ... have made a practice of wilfully stopping individuals on the chance hope that they will consent to a search...." Br. at 18. He claimed further that he intended to present proof showing "their practice of stopping cars on the basis of a claimed anonymous tip ..." *Id.* at 18–19. This evidence would, he implied, illustrate "the penchant the police have for using the investigative stop technique to harass Blacks and minorities in particular." He reiterated this position in his reply brief. Reply at 2–3.

No such testimony was given at the hearing.

5. The fourth amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures; shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

904 F.2d 357 (6th Cir.1990) (same); *United States v. Sangineto–Miranda*, 859 F.2d 1501, 1511 (6th Cir.1988) (same). The government bears the burden of establishing the existence of exigent circumstances. *Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984).

■ When prompted by exigent circumstances, however, officers acting in good faith and with a reasonable belief that they have probable cause for a search may take steps to secure the status quo, to prevent the time required to obtain a warrant from defeating the very purpose for which the warrant is sought. In other words, the fourth amendment guarantee is not offended when:

> officers, *having probable cause,* enter premises and *with probable cause,* arrest the occupants ... [and] secure the premises from within to preserve the status quo while others, in good faith, are in the process of obtaining a warrant ...

*Segura v. United States*, 468 U.S. 796, 798, 104 S.Ct. 3380, 3382, 82 L.Ed.2d 599 (1984) (emphasis added). *See also United States v. Sangineto–Miranda*, 859 F.2d 1501, 1511 n. 6 (6th Cir.1988); *United States v. Korman*, 614 F.2d 541 (6th Cir.), *cert. denied*, 446 U.S. 952, 100 S.Ct. 2918, 64 L.Ed.2d 808 (1980).

Courts have recognized that cases involving illegal drugs often present exigent circumstances because the evidence is so readily destroyed. *E.g., Sangineto–Miranda*, 859 F.2d at 1511–12; *United States v. Socey*, 846 F.2d 1439, 1444–45 (D.C.Cir.), *cert. denied*, 488 U.S. 858, 109 S.Ct. 152, 102 L.Ed.2d 123 (1988). Nevertheless, the officers must have an "objectively reasonable basis" for believing that such contraband is inside the premises in question, and that its destruction is imminent. *Sangineto–Miranda*, 859 F.2d at 1512. *See also Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970). Moreover, the officers must do no more than secure the premises to prevent such destruction. *Id.* at 1513; *Socey*, 846 F.2d at 1448; *United*

*States v. Elkins*, 732 F.2d 1280, 1285 (6th Cir.1984). Whether or not the officers have a proper basis for concluding that they should enter the premises is a function of the circumstances known to them at the time of their decision, and not of facts which may come to light subsequently. *Elkins*, 732 F.2d at 1284. *See also Socey*, 846 F.2d at 1446; *United States v. Rivera*, 825 F.2d 152, 156 (7th Cir.), *cert. denied sub nom. Robles v. United States*, 484 U.S. 979, 108 S.Ct. 494, 98 L.Ed.2d 492 (1987).

With respect to cases like the present one involving the risk of destruction of illegal drugs, the Court of Appeals has held:

> a police officer can show an objectively reasonable belief that contraband is being, or will be, destroyed within a residence if he can demonstrate: 1) a reasonable belief that third parties are inside the dwelling; and 2) a reasonable belief that these third parties may soon become aware the police are on their trail, so that the destruction of evidence would be in order.

*Sangineto–Miranda*, 859 F.2d at 1512.

■ Considering the evidence presented at the hearing, and with special reference to Ohio Revised Code Sections 2935.03 and 2935.03.05, the Court finds that no exigent circumstances existed to support either the officers' crossing into Euclid or their pre-warrant entry into the house.[6] Plainly, the officers were not in "hot pursuit" of Alexander, as he was handcuffed in their squadcar.

At the hearing, the officers stated that they were "continuing their investigation." However, the crime for which they had arrested Alexander—possession of one kilogram of cocaine—was complete. Because they already had all of the relevant evidence concerning that crime, there was no need to continue an investigation with respect to that offense. Evidently, however, the officers were simply assuming that other crimes had been or would be committed, evidence of which might be found at Alex-

---

**6.** The officers never contend, as Alexander suggests they must, that they were acting as federal agents. Moreover, they charged him with viola-

tions of the state drug laws. They proffer no reason why the jurisdictional restrictions of O.R.C. §§ 2935.03 and 2935.04 would not apply.

ander's residence. Beyond any personal beliefs and knowledge they may have had concerning drug trafficking generally, they had no factual basis for this assumption. They did not know anything about Alexander's specific involvement in drug trafficking, or anything else about him, but simply assumed that persons in possession of large quantities of drugs are likely to have more such drugs concealed or available. Unlike *Sangineto–Miranda*, therefore, they lacked any basis upon which to form a reasonable belief that there was another person who would know they had arrested Alexander and who would destroy evidence before they could procure a warrant. Therefore, their entry to "secure" the house from the inside was unreasonable.

The government also relies on the "independent source doctrine," according to which evidence which may have been obtained via an improper search may be admitted if it could have been obtained instead via another, constitutionally proper, route. *Murray v. United States*, 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988); *Segura*, 468 U.S. at 796, 104 S.Ct. at 3380. In this case, the government asserts that any degree of taint created by the warrantless initial entry became irrelevant upon the later issuance of the warrant. The government argues that, because the officers determined to seek a warrant before entering the residence, and because the affidavit contained no information gathered pursuant to that initial entry, the warrant is not tainted and is presumptively valid. *Segura*, 468 U.S. at 814, 104 S.Ct. at 3390. The government thus concludes that "the exclusionary rule will bar ... use [of the evidence] at trial only in the event the warrant itself proves to be fatally defective." Br. at 11. Upon reflection it becomes evident that, if the warrant is found to be "fatally defective," then the independent source argument is moot. The Court thus defers consideration of this argument.

### B. Validity of the warrant

The Court next considers whether the warrant to search Alexander's residence was supported by probable cause.

Probable cause exists where it is reasonable to conclude, based on the "totality of the circumstances," that evidence or persons are likely to be found at a particular location. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–34, 76 L.Ed.2d 527 (1983); *United States v. Loggins*, 777 F.2d 336, 338 (6th Cir.1985); *United States v. Lambert*, 771 F.2d 83, 92–93 (6th Cir. 1985). It is true that the judicial officer
> need not determine that the evidence sought is *in fact* on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place.

*United States v. Peacock*, 761 F.2d 1313, 1315 (9th Cir.), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985) (citations omitted) (emphasis in original). It is also true that the officer may place reliance on the conclusions of experienced law enforcement personnel. *United States v. Fannin*, 817 F.2d 1379, 1382 (9th Cir.1987). However, the officer must have "a substantial basis for determining the existence of probable cause, and ... wholly conclusory statement[s] ... fail[ ] to meet this requirement." *Gates*, 462 U.S. at 239, 103 S.Ct. at 2333. Thus, notwithstanding the deference due the judicial officer's assessment, *United States v. Ventresca*, 380 U.S. 102, 106–09, 85 S.Ct. 741, 744–46, 13 L.Ed.2d 684 (1965); *United States v. Algie*, 721 F.2d 1039, 1041 (6th Cir.1983), a reviewing court must deem the warrant invalid if the information set forth in the affidavit fails to demonstrate probable cause. *Lambert*, 771 F.2d at 92–93; *United States v. Savoca*, 761 F.2d 292, 296 (6th Cir.1985).

In his affidavit, White, an experienced law enforcement officer, asserted various reasons for his claimed belief that more cocaine was located at Alexander's residence. He cited Alexander's refusal to provide "personal information on himself," specifically his address. Plainly, however, the right to remain silent applies in such circumstances. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Once invoked, the fifth amendment requires the police to respect such desires without further inquiry.

*Smith v. Illinois,* 469 U.S. 91, 95, 105 S.Ct. 490, 492, 83 L.Ed.2d 488 (1984); *Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Michigan v. Moseley,* 423 U.S. 96, 105–06, 96 S.Ct. 321, 327–28, 46 L.Ed.2d 313 (1975); *Miranda,* 384 U.S. at 444–45, 86 S.Ct. at 1612–13. The officers were thus required to respect, without drawing an adverse inference from, Alexander's decision to exercise this right upon arrest.

The government is correct that routine information sought for booking or other administrative purposes can be deemed outside *Miranda's* protective scope. *United States v. Avery,* 717 F.2d 1020, 1024–25 (6th Cir.1983), *cert. denied,* 466 U.S. 905, 104 S.Ct. 1683, 80 L.Ed.2d 157 (1984). It is a fact-specific inquiry, however, whether, in a particular case, police efforts to obtain such "routine" information from a suspect are of a character "that the police should know [is] reasonably likely to elicit an incriminating response," and so constitute interrogation within *Miranda. Id.* (citing *Rhode Island v. Innis,* 446 U.S. 291, 301, 100 S.Ct. 1682, 1689–90, 64 L.Ed.2d 297 (1980)).

In this case, the testimony of the police officers themselves answers this question for the Court, for they acknowledged freely that they persisted in questioning Alexander as to his residence precisely because they believed that he had more cocaine there. They fully intended that he incriminate himself by providing this information. That that they were seeking booking information within the *Avery* doctrine is further belied by the fact that they booked Alexander with an address, 14422 St. Clair, that they knew to be inaccurate. Alexander was thus relying properly on his fifth amendment right when he refused to tell them where he lived. This reliance cannot support an adverse inference by the police.

White also cited Alexander's agitation upon the detectives' discovery of the East 235th Street address, and Alexander's refusal to consent to a search upon arrival at that address. Certainly, by the plain language of the fourth amendment, Alexander was entitled to withhold his consent, and his decision to do so cannot be construed as providing probable cause for conducting a search. *Cf. Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *United States v. Buchanan,* 904 F.2d 349 (6th Cir.1990); *United States v. McCaleb,* 552 F.2d 717, 721 (6th Cir.1977).

In essence, White stated that the large amount of cocaine already recovered, together with Alexander's desire not to reveal where he lived, provided probable cause for believing not only that he had more cocaine at home—wherever his home might be—but that the cocaine would be removed if not seized promptly.[7] White articulated no factual basis for believing that Alexander had more cocaine, that he stored this cocaine in his home, or that other persons were likely to know either where the cocaine was, or that it was in danger of police discovery because Alexander had been arrested. Plainly, a myriad of reasons may prompt one to desire to avoid late-night intrusion into one's home and, in this case, that desire was the sole piece of evidence the officers had to take them beyond the scene of Alexander's arrest.

 Moreover, although a presumption of validation arises from the fact that Judge Jones reviewed White's affidavit and signed the warrant, the detectives had not provided her a fair or complete picture of the activities at 235 East 235th Street. White averred that "The male was in possession of the keys to the house and the premises was [sic] secured." He failed to explain that, despite the fact that they had

---

7. In his affidavit, White stated that:
 We went to the address with the purpose of identifying the occupants and the address of our suspect ... Due to the large amount of cocaine taken from the male we felt that it was imperative to secure the premises to prevent any other cocaine from leaving the residence.

He then stated that he
 believe[d] based on his training and experience, that based on the incident that occurred [apprehension of the first bag of cocaine] and the males [sic] evasiveness concerning his residence that there is more cocaine in the residence and that if the premises is [sic] not searched it will be taken from the residence.

no knowledge of other involved persons, the premises had been secured *from the inside.* He also omitted to mention that Alexander was, at that time, being held handcuffed and incommunicado in his own living room, having been neither booked nor permitted to contact anyone, nor provided medical care.

Upon review of the evidence presented at the hearing, it is clear that a "reasonably prudent" person would have had no objective, articulable basis at all for believing that drugs or evidence might be found at 235 East 235th Street. Given their experience at 14422 St. Clair, the officers certainly had no sound reason for associating Alexander with that address. Nothing was known independently that associated the address with drug trafficking, for example, from surveillance or anonymous tips. *Loggins,* 777 F.2d at 338; *Lambert,* 771 F.2d at 92–93. By their own admission at the hearing, without trying Alexander's keys in the lock, viewing his mail, personal papers and photographs inside the premises, the officers did not know whether they were in his home or not.[8] By proving Alexander's desire to avoid midnight entry into his home, even in light of the officers' collective experience with other drug traffickers, the government does not carry its burden of demonstrating a "substantial basis" for a finding of probable cause, as it must under *Gates.*

C. The good faith exception to the exclusionary rule

▇▇ Relying upon *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the government asserts that, a conclusion that the warrant lacked probable cause notwithstanding, the evidence seized at 235 East 235th Street should be admitted against Alexander because the officers acted in good faith and reasonably when executing the warrant. In such a context, a reviewing court must find that the affidavit supporting the warrant was "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923, 104 S.Ct. at 3421 (citing *Brown v. Illinois,* 422 U.S. 590, 610–11, 95 S.Ct. 2254, 2265–66, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)). The defendant has the burden of proof on this issue, and the court must so find by a preponderance of the evidence. *Franks v. Delaware,* 438 U.S. 154, 156, 98 S.Ct. 2674, 2676, 57 L.Ed.2d 667 (1978).

The essential fact presented in the affidavit to establish that the location to be searched was indeed Alexander's residence was Detective White's sworn statement that Alexander had admitted that "he did live there but refused to sign a consent search." According to the testimony of Detective Carosielli and Sergeant Gercar, however, no such admission took place. Both of them stated that they had not known they were at Alexander's home before, respectively, seeing mail, inside the premises, addressed to Alexander, and trying his keys in the lock. In fact, White was not consistent in his testimony, for he stated that he knew that they were in Alexander's home when he saw Alexander's mail and a picture of Alexander "and his girlfriend" on the wall inside.

In addition to the officers' inconsistent testimony, the Court found it implausible that Alexander would adamantly refuse to give his address, despite the officers' persistence and annoyance, while being driven, for several hours, from place to place, and being urged to cooperate, and then capitulate and identify it at such a convenient moment. Although aspects of Alexander's

---

8. Because, before entering it, the officers lacked a factual basis for assuming that they had located Alexander's home, the Court need not reach the assumption, approved by other circuit courts of appeal, notably the Ninth, but not yet ruled on definitively by the Sixth Circuit, that it is reasonable per se to believe that drugs and other evidence of criminality will be found at the homes of drug traffickers. *E.g., United States v. Safari,* 849 F.2d 891 (4th Cir.), *cert.* denied, 488 U.S. 945, 109 S.Ct. 374, 102 L.Ed.2d 363 (1988); *United States v. Fannin,* 817 F.2d at 1382; *United States v. Angulo–Lopez,* 791 F.2d 1394, 1399 (9th Cir.1989); *United States v. Dicesare,* 765 F.2d 890, 896–97 (9th Cir.1985); *United States v. Peacock,* 761 F.2d at 1315; *United States v. Foster,* 711 F.2d 871, 879 (9th Cir.1983), *cert. denied,* 465 U.S. 1103, 104 S.Ct. 1602, 80 L.Ed.2d 132 (1984).

testimony rang falsely, his claim that he remained silent at that point was totally believable. Thus, the Court is persuaded that White's averment was a fabrication intended to convince Judge Jones that probable cause existed to justify the warrant sought.

Without that averment, the sole remaining basis in the affidavit for forming a reasonable belief that Alexander lived at the premises in question was the allegation that Alexander "was in possession of the keys to the house." As discussed above, the officers did not know, and had no way of knowing, that the keys fit the locks without taking the intrusive step of trying them. That is precisely the sort of reliance upon information obtained in violation of the fourth amendment proscribed in *Murray v. United States*, 108 S.Ct. at 2535.

This Court's finding that the probable cause set forth in Detective White's affidavit was fraudulent and deliberately incomplete does not impugn the independence or judgment of Judge Jones. Given the hour at which the warrant was requested and the assertions of exigency, her approval of the warrant was not unreasonable. Having deliberately presented her with an inaccurate and incomplete picture, however, the officers' present claim of good faith finds an unreceptive audience with this Court.

█ Having considered the evidence presented, the Court concludes not only that the officers kept Alexander with them to create an appearance of urgency and to ascertain whether they had located Alexander's residence, but also to conduct an investigation for which they knew they lacked a proper basis. Whether they began their search upon entry into the residence, as Alexander testified, or upon the arrival of the signed warrant, as the government maintains, is irrelevant because the search was neither reasonable under the circumstances nor conducted pursuant to a warrant issued upon probable cause. Accordingly, this Court must conclude that the search of Alexander's residence violated the fourth amendment, and that the evidence thus obtained may not be used against him at trial. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961).[9] Much as the Court lauds the efforts made daily by members of law enforcement to control and eradicate the scourge of illegal drug trafficking and related crime, to hold otherwise in this case would be to permit essential constitutional guarantees to become casualties of the "war on drugs." It is the plain duty of this Court to prevent such a sacrifice. For, however extreme the present national emergency, it will not be the last, and it is precisely in such troubled times that our precious constitutional guarantees are most sorely tried, and most sorely in need of assiduous protection.[10]

## V.

Alexander also seeks, pursuant to Crimi-

---

**9.** Having reached this conclusion, the Court need not consider whether the execution of the warrant was rendered invalid by the fact that the officers were outside their jurisdiction.

**10.** The Court is troubled by the potential fifth and sixth amendment implications of the officers' decision to hold and transport Alexander from place to place, trying to locate and then search his residence. He was shackled and held essentially hostage over a period of hours, and denied the opportunity to notify family and to consult with counsel, in flagrant violation of department policy and Ohio law. O.R.C. §§ 2935.14 and 2935.20; Ohio Rule of Criminal Procedure 4(E)(2). In such circumstances, how much substance remains of the fifth and sixth amendment guarantees of due process and the assistance of counsel? These constitutional guarantees have been secured by ritualized recitation of the *Miranda* warnings. But hasn't this ritual become hollow and a sham if a suspect is told he may consult with an attorney, but is denied the opportunity to do so, or is told he may remain silent, but is badgered and harassed over a period of hours when he attempts to exercise that right. The Court found Alexander credible when he testified that he refused to give his address, that he requested medical attention and an opportunity to telephone his father. The testimony tended to establish that, instead of respecting Alexander's requests for a telephone and to remain silent, he was held incommunicado for a period of hours, transported from place to place, and badgered for information that was likely to incriminate him.

Although Alexander raises these issues in his reply brief, they are neither germane to the present motion nor briefed and argued. The Court thus does not rule upon them.

nal Rule of Procedure 41(e),[11] the return of the noncontraband personal property taken from his residence. This includes: a video cassette recorder, a typewriter, two mobile telephones, a pager, jewelry, a photograph album, personal papers and, most significantly it appears, a large amount of cash. The government takes the position that, notwithstanding its admissibility, some or all of this property may be subject to civil forfeiture, pursuant to 21 U.S.C. § 881, following Alexander's conviction.[12] Upon consideration, the Court defers consideration of this motion for at least thirty (30) days from the date of this order.

## VI.

Accordingly, this Court concludes that Alexander's motion to suppress evidence must be denied with respect to the evidence seized incident to his arrest, and granted with respect to the evidence seized incident to the search of his residence.

IT IS SO ORDERED.

11. In relevant part, Rule 41(e) provides:
A person aggrieved by an unlawful search and seizure or by the deprivation of property may move the district court ... for the return of the property on the ground that such person is entitled to lawful possession of the property. The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be returned to the movant, although reasonable conditions may be imposed to protect access and use of the property in subsequent proceedings.

12. In the indictment, the government also sought forfeiture of the Blazer, pursuant to the criminal forfeiture statute. 21 U.S.C. Section 853. Alexander did not challenge this effort during the suppression hearing.